**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 10, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JULIE HUFF,

     Plaintiff - Appellant,

v.

CHRISTOPHER REEVES, an Oklahoma
highway patrolman; KEVIN
LEDBETTER, McIntosh County Sheriff,

     Defendants - Appellees.

No. 20-7013

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:18-CV-00022-RAW)**
_____

J. Derek Ingle, Boettcher, Devinney, Ingle & Wicker, Tulsa, Oklahoma, for Plaintiff-Appellant.

Charles A. Dickson, III (Kari Y. Hawkins, Assistant Attorney General, on the brief), Oklahoma Attorney General's Office, Oklahoma City, Oklahoma, for Christopher Reeves.

Wellon B. Poe (Alison B. Levine and Jamison C. Whitson with him on the brief), Collins, Zorn & Wagner, P.C., Oklahoma City, Oklahoma, for McIntosh County Sheriff Kevin Ledbetter.

_____

Before **HARTZ**, **KELLY**, and **PHILLIPS**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

January 21, 2016, was a terrible day for Julie Huff. She went to a local bank to access her safe-deposit box. Then all hell broke loose. Cedric Norris entered the bank, murdered the bank president, grabbed some money from tellers, and took Ms. Huff hostage, forcing her to drive the getaway vehicle. Police officers pursued the vehicle and were able to force it to crash. At first, Norris fired at the officers and fled in one direction while Ms. Huff fled away from him. She raised her arms and faced the officers. But they fired at her and she fell to the ground. Later, Norris came up behind her and used her body as a shield. Norris was killed in the shootout. Ms. Huff was shot at least 10 times.

Unsurprisingly, Ms. Huff filed suit under 42 U.S.C. § 1983 for violations of her civil rights. Among other things, she alleged that Oklahoma Highway Patrol Trooper Chris Reeves used excessive force against her, in violation of the Fourth and Fourteenth Amendments. She also sued McIntosh County Sheriff Kevin Ledbetter for failure to properly train his deputies.

The district court granted summary judgment to both defendants. It said that Reeves did not violate Ms. Huff's constitutional rights because he did not shoot her intentionally. And it dismissed the claim against the sheriff on the grounds that Ms. Huff could neither demonstrate a predicate constitutional violation by one of his deputies nor identify any specific training deficiency related to the alleged violation.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the grant of summary judgment on the Fourteenth Amendment claim against Reeves and the failure-to-train claim against Sheriff Ledbetter but reverse and remand on the Fourth

2

Amendment claim against Reeves. We hold that Ms. Huff cannot invoke Fourteenth Amendment substantive due process in the circumstances of this case and that she has failed to point to any additional training of Ledbetter's personnel that could have prevented the alleged constitutional violation. But we conclude that Ms. Huff has presented a genuine issue of material fact on whether Reeves shot her intentionally. And because it is clearly established in this circuit that an officer may not employ deadly force against a person who poses no threat, Reeves is not entitled to qualified immunity at this stage of the proceedings.

## I.    BACKGROUND

Most of the pertinent facts are undisputed. To the extent that witnesses differ and different inferences can be drawn from the evidence, we review matters in the light most favorable to Ms. Huff because the case comes before us on summary judgment. *See Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) ("At the summary judgment stage . . . , the court may not weigh evidence and must resolve genuine disputes of material fact in favor of the nonmoving party.").

About 9:30 a.m. on January 21, 2016, Ms. Huff went to the Bank of Eufala in Eufala, Oklahoma, to access her safe-deposit box. While she was seated next to the desk of bank employee Betty Howell, Cedric Norris entered the bank, walked into the office of the bank's president, Randall Peterson, and shot him dead. Norris got some cash from the tellers and approached Ms. Howell, demanding that she accompany him as a hostage. When Ms. Howell refused, Norris shot her in the abdomen. He then grabbed Ms. Huff's arm, pushed his gun in her side, and took her as his hostage

3

to drive his getaway vehicle, a white sport utility vehicle (SUV) that he had stolen two days before.

At Norris's direction, Ms. Huff drove north onto U.S. Route 69. By this time, local law enforcement had begun to respond to reports of the bank robbery. When Eufala Police Officer Casey Torix arrived at the bank, he was informed "that a black suspect, dressed as a female, left the bank in a white [SUV] with a white female hostage." Aplee. J. App., Vol. I at 192. Ms. Huff is a white woman and Norris was a black man. Correctly surmising the direction the culprit had gone, Torix drove north on Route 69 until he realized that he was behind the suspect vehicle. Defendant Chris Reeves, an Oklahoma Highway Patrol Trooper, then joined the pursuit in his vehicle. He had been informed in a McIntosh County radio transmission that there were two female suspects, one white and one black. Reeves took the lead in the pursuit.

After the white SUV exited Route 69 and headed west on Onapa Road, McIntosh County Chief Deputy Sheriff Dewayne Hall attempted to block it with the vehicle he was driving. But rather than stop, the SUV swerved around Hall's vehicle at a high rate of speed. Norris fired two shots at Hall through the windshield of the SUV. Reeves then managed to hit the rear of the SUV with his vehicle, causing the SUV to spin off the road and come to a stop on the south side of Onapa Road, facing west. Before coming to a stop, the SUV collided with a wire fence set back from the road, creating an opening in the fence. Reeves braked hard, stopping his vehicle some distance farther west down Onapa Road, facing southwest. Officer Torix, who

4

had been following Reeves, stopped his vehicle short of where the SUV had spun off the road, east of both the SUV and Reeves's vehicle.

When the SUV came to a stop, Norris exited from the passenger-side door and fired two shots, prompting Trooper Reeves and Officer Torix to take cover behind their vehicles. Ms. Huff, fearing that Norris would return and kill her if she remained in the SUV, exited from the driver-side door and ran east, back along the length of the SUV toward the opening in the fence created by the SUV. As she ran, Ms. Huff had her hands up in the air. After reaching the fence opening, she ran a few feet into the field and turned east, toward the vehicle of Officer Torix. As she turned, she was shot twice, once in her leg and once in her forearm.

After she was hit, Ms. Huff fell to the ground and called out, "Stop shooting me; stop shooting me." Aplt. App., Vol. 2 at 207 (internal quotation marks omitted). But the officers continued to fire, hitting her at least eight more times as she lay on the ground. At some point during the shootout, Norris made his way over to Ms. Huff and came up behind her. Although Ms. Huff testified at her deposition that she did not recall Norris touching her, the parties agree that Norris was lying behind Ms. Huff, attempting to use her "as a shield or sand bag." Aplt. Br. at 4 (internal quotation marks omitted). When Reeves saw Norris eventually go "face down on the ground," Aplee. J. App., Vol. I at 173, he believed that Norris no longer posed an immediate threat, so he returned to his cruiser and radioed headquarters to request emergency medical services.

5

While Reeves was contacting headquarters, two more shots were fired. Although it is not known whether those shots were fired by Torix or Hall, who had arrived shortly after Reeves and Torix, the parties all agree that Hall fired two shots at Norris. When the shooting ended, several officers—Reeves, Oklahoma Highway Patrol Trooper Randy Cox, Torix, and Checotah Police Chief Darren Glover—converged on Norris and Ms. Huff, who was lying in the grass just to the south of the white SUV. Norris, who "was wearing women's clothing," was unresponsive. *Id.* at 194.

The entire shooting lasted about a minute. Reeves, Torix, and Hall fired 31, 4, and 2 rounds, respectively. Ms. Huff was struck by at least 10 of those rounds. Because many of the bullets passed through Ms. Huff, there is some uncertainty regarding who fired each of the individual bullets that struck her. But it is undisputed that Reeves fired one bullet that is still lodged in her pelvis, as well as at least three of the other nine-plus that struck her. Throughout the encounter both Reeves and Hall were unaware that Huff was a hostage, believing erroneously that she was instead a suspect. Also, Reeves swore in an affidavit that he did not see Ms. Huff at all from the time the SUV spun off the road until he approached her and Norris after the shooting ended. Norris was shot four times.

Ms. Huff sued the City of Eufala, Eufala Police Chief Don Murray, Torix, and McIntosh County Sheriff Kevin Ledbetter in the United States District Court for the Eastern District of Oklahoma, alleging various claims under 42 U.S.C. § 1983.

6

Reeves was later added as a defendant, while Murray and Torix were dismissed without prejudice. The City of Eufala was dismissed under a settlement agreement.

The remaining defendants—Reeves and Ledbetter—filed separate motions for summary judgment. Reeves asserted the defense of qualified immunity, arguing that Ms. Huff could not prove that he violated her rights under either the Fourth or Fourteenth Amendment and that, in any event, any right that he might have violated was not clearly established. Sheriff Ledbetter argued that Ms. Huff could not establish supervisory liability because there was no underlying constitutional violation by any of his deputies and because any violations "were not the result of [his] policies, practices, or customs." Aplee. J. App., Vol. I at 104 (capitalization omitted).

The district court granted the defendants' motions. *See Huff v. Reeves*, No. CIV-18-022-RAW, 2020 WL 1046954, at *8–9 (E.D. Okla. Mar. 4, 2020). On the claims against Reeves, the court concluded that Ms. Huff could not prove a violation of her rights under either the Fourth or Fourteenth Amendments because "[t]here is no evidence that Trooper Reeves saw and intentionally shot her." *Id.* at *7; *see id.* at *8 ("Reeves did not violate [Ms. Huff's] constitutional rights when he returned Norris' fire and accidentally shot her."). On the claims against Sheriff Ledbetter, the district court concluded that summary judgment was appropriate both because there was no predicate constitutional violation by Deputy Hall and because Ms. Huff "ha[d] not shown any specific training deficiency that was closely related to the alleged violations of her constitutional rights." *Id.*

7

## II.    DISCUSSION

We review grants of summary judgment de novo.  *See Stonecipher*, 759 F.3d at 1141.  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Applying this standard, we conclude that Ms. Huff has presented a triable issue on whether Trooper Reeves violated her clearly established Fourth Amendment rights by intentionally shooting her after she exited the SUV with her hands up.  We therefore reverse the district court's grant of summary judgment on that claim.  But we affirm the district court's grants of summary judgment on the remaining claims against Reeves and Ledbetter.

### A.    Fourth Amendment Claim Against Reeves

The Fourth Amendment prohibits law-enforcement officers from unreasonably seizing a person.  *See* U.S. Const. amend. IV.  "The application of physical force to the body of a person with intent to restrain is a seizure" under the Fourth Amendment.  *Torres v. Madrid*, 141 S. Ct. 989, 994 (2021).

Reeves contends that qualified immunity protects him from Ms. Huff's Fourth Amendment claim.  To overcome a qualified-immunity defense at summary judgment, a plaintiff must demonstrate (1) that "on the facts alleged . . . the defendant violated his or her constitutional rights," and (2) "that the right was clearly established at the time of the alleged unlawful activity."  *Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018) (brackets and internal quotation marks omitted).

8

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010) (internal quotation marks omitted). Although a plaintiff "must demonstrate a substantial correspondence between the conduct in question and prior law," she "need not show that the specific action at issue has previously been held unlawful." *Riggins v. Goodman*, 572 F.3d 1101, 1111 (10th Cir. 2009) (internal quotation marks omitted). It suffices that "the alleged unlawfulness [is] apparent in light of preexisting law." *Id.* (internal quotation marks omitted). That is, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam) (internal quotation marks omitted).

The district court focused on the first prong of the qualified-immunity defense, holding that Ms. Huff's Fourth Amendment rights were not violated because "[t]here [was] no evidence that Trooper Reeves saw and intentionally shot [Ms. Huff]," and therefore any "seizure was not willful," as required for such a constitutional claim. *Huff*, 2020 WL 1046954, at *7. The court relied on our opinion in *Childress v. City of Arapaho*, 210 F.3d 1154 (10th Cir. 2000). Two escaped prisoners had stolen the plaintiffs' minivan and taken them as hostages as the prisoners attempted to elude police. *See id.* at 1155. In an effort to halt the escape, officers fired multiple shots at the minivan, inflicting several wounds on the plaintiffs. *See id.* at 1155–56. We held

9

that the plaintiffs' Fourth Amendment rights were not violated because they had not been "seized" by the officers within the meaning of the Amendment. *Id.* at 1157. As we explained, "[t]he officers intended to restrain the minivan and the fugitives, not [the plaintiffs]." *Id.*; *see Torres*, 141 S. Ct. at 994 (seizure under Fourth Amendment requires "intent to restrain").

*Childress* would be highly relevant, indeed dispositive, if the evidence established that Trooper Reeves was shooting only at Norris and the wounds to Ms. Huff were just "the unfortunate . . . accidental effects of otherwise lawful conduct." *Childress*, 210 F.3d at 1157 (internal quotation marks omitted). If, however, Reeves intentionally shot Ms. Huff (perhaps because he thought she was implicated in the robbery and murder), *Childress* is not in point. We therefore begin by addressing whether the record would support a jury finding that Reeves intentionally shot Ms. Huff. Concluding that there was sufficient evidence to support such a finding, we then turn to whether a shooting in that circumstance would violate Ms. Huff's rights under the Fourth Amendment and whether that law was clearly established at the time of the incident.

The district court correctly observed that Reeves denied under oath that he saw Ms. Huff when he was firing his weapon. But that denial is not dispositive. The record contains ample evidence from which a jury could reasonably infer that Reeves saw and intentionally shot Ms. Huff after she exited the SUV. To begin with, the very fact that Ms. Huff was repeatedly struck by bullets from Reeves's gun strongly implies that she was in his line of sight. The shooting was in broad daylight. And

10

the fact that she was struck by bullets so often (at least 10 times) makes it hard to believe that she was not being aimed at. Nor can her being struck so often be blamed on her proximity to Norris, who was struck only four times, compared to her 10. Ms. Huff testified at her deposition that she and Norris exited on *opposite sides* of the SUV and that she "had [her] hands up and ran a short distance . . . into the field" abutting Onapa Road. Aplt. App., Vol. 2 at 205. She said that she was "running away from Cedric Norris" and "never saw [him] again once he exited the vehicle." *Id*.

Although circumstantial, the evidence described in the preceding paragraph is more than sufficient to permit a factfinder to reject Reeves's account. *See Pauly v. White*, 874 F.3d 1197, 1218 (10th Cir. 2017) ("[T]he court may not simply accept what may be a self-serving account by the police officer. Rather, it must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." (original brackets and internal quotation marks omitted)). A reasonable jury could infer that Reeves shot Ms. Huff because he believed her to be a party to a murder. Indeed, a report of an interview of Reeves by fellow officers a little more than three weeks after the incident states that he believed that the white female had been an active participant in the crime and had shot at him.

We now turn to whether intentionally shooting Ms. Huff would have been a violation of the Fourth Amendment and, if so, whether the law in that respect was

11

clearly established when she was shot. The ultimate test for determining whether the use of force by a law-enforcement officer violated the Fourth Amendment is whether it was reasonable. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). The inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. The reasonableness determination "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). Courts must keep in mind "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. Because the test of reasonableness "is not capable of precise definition or mechanical application, . . . its proper application requires careful attention to the facts and circumstances of each particular case." *Id.* at 396 (internal quotation marks omitted).

We are not, however, without guidance. To assist us in assessing whether the use of force, particularly deadly force, complied with the Fourth Amendment, this court has employed two complementary frameworks. First, *Graham* itself identified three nonexclusive factors for consideration: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Second, this court has provided additional guidance regarding the

12

second *Graham* factor, which is "undoubtedly the most important and fact intensive factor." *Pauly*, 874 F.3d at 1216 (internal quotation marks omitted). In *Estate of Larsen ex rel. Sturdivan v. Murr*, we identified four nonexclusive factors to be considered in assessing the threat posed by a suspect: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." 511 F.3d 1255, 1260 (10th Cir. 2008).

Moreover, we need not go through the *Graham*/*Larsen* framework in every excessive-force case. Some narrower propositions have been clearly established by their repeated application in our case law. One such proposition is that officers are prohibited from using deadly force against a person when it is apparent that the person poses no physical threat to the officers or others. *See Reavis (Estate of Coale) v. Frost*, 967 F.3d 978, 995 (10th Cir. 2020) (clearly established as of 2016 "that an officer may not use deadly force to stop a fleeing vehicle [driven by a suspect] when a reasonable officer would have perceived he was in no immediate danger at the time he fired"); *McCoy v. Meyers*, 887 F.3d 1034, 1052 (10th Cir. 2018) (clearly established as of 2011 that "the Fourth Amendment prohibits the use of force without legitimate justification, as when a subject poses no threat or has been subdued"); *Fancher v. Barrientos*, 723 F.3d 1191, 1201 (10th Cir. 2013) (clearly established that officer acted unreasonably in continuing to shoot suspect who, after being hit by the first shot, no longer "posed a threat of serious harm to [the officer] or others";

13

"'[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so'" (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985))); *Zia Trust Co.*, 597 F.3d at 1155 (clearly established that officer's shooting into van was unreasonable when officer "did not have probable cause to believe that there was a serious threat of serious physical harm to himself or others" (internal quotation marks omitted)); *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008) ("We do not think it requires a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself."); *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2008) (clearly established that it was unreasonable for officer to shoot suspect who "had made no threats and was not advancing on anyone"; officer's belief that suspect was pointing a gun at him was unreasonable, and knife he was holding was small knife that he was holding to his own wrist; suspect "was not actively resisting arrest, and there was no need to use deadly force to prevent him from fleeing and possibly harming others").

Here, Ms. Huff testified that she raised her hands in surrender as she approached the officers when she was first shot. If her version of events is believed, she was not evading apprehension and she posed no threat to the officers or anyone else. Perhaps Reeves reasonably viewed the situation otherwise, viewing her as an accomplice to murder who was shooting at him. But that is a question for the jury. On facts that could reasonably be found by the jury, Reeves's shooting at Ms. Huff

14

was contrary to clearly established Fourth Amendment law. We acknowledge that none of the above-cited cases addresses the *precise* set of facts now before us. But in our view "existing precedent . . . ha[s] placed the . . . question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The Supreme Court decision in *Mullenix v. Luna*, 577 U.S. 7 (2015) (per curiam), relied on by Reeves, is not to the contrary. The question in that case was whether officers had violated clearly established law by shooting at a car driven by someone who was fleeing arrest. There was no doubt that the driver posed at least some risk to officers and the public. The suspect "had led police on a 25-mile chase at extremely high speeds, was reportedly intoxicated, had twice threatened to shoot officers, and was racing towards an officer's location." *Id*. at 14. The Fifth Circuit had denied qualified immunity, stating that the law was clearly established that "a police officer may not use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Id*. at 12 (internal quotation marks omitted). The Supreme Court held that this formulation of clearly established law was defined at too "high [a] level of generality." *Id.* at 16. The central issue was whether the suspect posed "a *sufficient* threat" to justify the defendant officer's shooting into his vehicle from an overpass, *id.* at 15 (emphasis added), and that question had not been clearly answered by precedent. The case before us, in contrast, presents no problem of weighing the costs and benefits of using deadly force. Viewing the evidence in the light most favorable to Ms. Huff, it would have been unreasonable for Reeves to believe that she presented any threat to him or anyone

15

else.  The precedents cited above clearly establish that shooting her under those circumstances was unlawful.

## B.     Fourteenth Amendment Claim Against Reeves

In addition to her Fourth Amendment claim against Reeves, Ms. Huff also alleged a substantive-due-process violation under the Fourteenth Amendment.  Like her Fourth Amendment claim, Ms. Huff's substantive-due-process claim focuses on the force employed by Reeves.  *See* Aplee. J. App., Vol. I at 39 ("The force used by the Defendants shocks the conscience and violates the Constitutional rights of the Plaintiff.").  The district court granted summary judgment in Reeves's favor on this claim too, holding that because "there is no evidence that Trooper Reeves acted with intent to harm [Ms. Huff] . . . , there is no constitutional liability . . . ."  *Huff*, 2020 WL 1046954, at *8 (internal quotation marks omitted).

We affirm the district court's summary judgment on this claim, but on a different ground:  the Fourteenth Amendment is an inappropriate source for a constitutional claim in the present context.  The Supreme Court has "always been reluctant to expand the concept of substantive due process," and "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (brackets and internal quotation marks omitted).  In keeping with this principle, *Graham* held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in

16

the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. at 395; *see Cortez v. McCauley*, 478 F.3d 1108, 1145 (10th Cir. 2007) (en banc) (Gorsuch, J., concurring in part) (noting "the Supreme Court's command in *Graham* that excessive force claims arising from a seizure are to be analyzed under the Fourth Amendment rather than through some other (*e.g.*, Fourteenth Amendment) constitutional lens"). Because Ms. Huff's excessive-force claim against Reeves alleges a prearrest *seizure*, *see Torres*, 141 S. Ct. at 994, it is properly analyzed under the Fourth, rather than the Fourteenth, Amendment.[1]

### C. Failure-to-Train Claim Against Sheriff Ledbetter

Ms. Huff also asserted a failure-to-train claim against Sheriff Ledbetter in his official capacity as Sheriff of McIntosh County.[2] Her operative complaint alleged that Ledbetter's failure to provide adequate training on "the handling of hostage situations" and his "cho[ice] to give priority to the apprehension or liquidation of a

---

[1] To the extent that Ms. Huff's Fourteenth Amendment claim against Reeves could be construed as alleging that Reeves would be liable even if he did not seize her (by *intentionally* shooting her), so long as he was reckless or deliberately indifferent to her welfare, the claim fails. The liability of law-enforcement officers under the Fourteenth Amendment "on an occasion calling for fast action," *Lewis*, 523 U.S. at 853, requires "a purpose to cause harm," *id.* at 854.

[2] Although Ms. Huff's Second Amended Complaint failed to specify in what capacity she intended to sue Ledbetter, the district court reasonably assumed that she intended to sue him in his official capacity only, *see Huff*, 2020 WL 1046954, at *8 n.14. In any event, Ms. Huff has not mentioned the issue on appeal.

17

criminal offender over the right to be free of excessive force and to be secure in their bodily integrity" are connected by "a direct causal link . . . [to] the constitutional deprivation suffered by [Ms. Huff]." Aplee. J. App., Vol. I at 40–41. The district court granted summary judgment in favor of Ledbetter, holding that there was no predicate constitutional violation by Deputy Hall (the only officer under his command on the scene at the time of the shooting) *and* that Ms. Huff "ha[d] not shown any specific training deficiency that was closely related to the alleged violations of her constitutional rights." *Huff*, 2020 WL 1046954, at *8.

"[T]o establish a municipality's liability for inadequate training on the use of force, a plaintiff must meet a four-part test":

> A plaintiff must show (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city towards persons with whom the police officers come into contact[;] and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Myers v. Oklahoma Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998) (brackets and internal quotation marks omitted). This same test applies to claims against a municipal official "acting in his or her official capacity," which "are the same" as claims against a municipality itself. *Id.* at 1316 n.2 (internal quotation marks omitted).

On appeal Ms. Huff raises two claims of inadequate training. First, she faults Ledbetter for "fail[ing] to provide adequate training for law enforcement officers in

18

the handling of hostage situations." Aplt. Br. at 46. She complains of a lack of training on "rules of engagement when hostages were used as human shields," and a lack of training "to determine the status of parties involved in shooting scenarios." *Id*. It is undisputed, however, that McIntosh County Sheriff's Deputies, including Deputy Hall, received training on the proper use of force. In particular, Ms. Huff does not dispute Ledbetter's declaration that deputies such as Hall "are trained not to purposefully or with any intent attempt to harm an individual who is not a threat to that particular officer, any other law enforcement officer or any member of the public when responding to an incident including a shooting incident." Aplee. J. App., Vol. I at 128. In light of this evidence, Ms. Huff needed to explain what additional training regarding hostages would have caused Deputy Hall not to fire his gun at her when she was clearly surrendering. But no explanation is forthcoming in her briefs on appeal, or even in the report of her use-of-force expert, Scott DeFoe.[3] Because there is no "direct causal link between the [alleged] constitutional deprivation and the [alleged] inadequate training," this training claim must be rejected. *Myers*, 151 F.3d at 1318 (internal quotation marks omitted).

Ms. Huff's second failure-to-train theory is that Ledbetter "fail[ed] to train and supervise Sheriff's Dispatch on the critical need for adequate information to guide Deputy Hall, as well as other law enforcement personnel tuned into County

---

[3] We assume without deciding that we may consider the expert report despite challenges by Reeves and Ledbetter.

broadcasts." Aplt. Br. at 48.[4] But, again, neither Ms. Huff nor DeFoe's expert report has identified any training that would have prevented Hall's alleged constitutional violation. We have repeatedly held that conclusory or generalized failure-to-train allegations are insufficient. *See Keith v. Koerner*, 843 F.3d 833, 838–39 (10th Cir. 2016) ("It is not enough to allege general deficiencies in a particular training program. Rather, a plaintiff must identify a specific deficiency in the entity's training program closely related to his ultimate injury." (brackets, citation, and internal quotation marks omitted)); *Carr v. Castle*, 337 F.3d 1221, 1231 (10th Cir. 2003) ("Many courts have highlighted the importance of the [requirement that the alleged training deficiency be closely related to the ultimate injury], ruling that a general lack of training is insufficient."). Accordingly, we hold that Ledbetter is entitled to summary judgment on Ms. Huff's second failure-to-train theory.

## III. CONCLUSION

The district court's grant of summary judgment on Ms. Huff's Fourteenth Amendment claim against Trooper Reeves and her failure-to-train claim against Sheriff Ledbetter is **AFFIRMED**. The district court's grant of summary judgment on Ms. Huff's Fourth Amendment claim against Reeves is **REVERSED** and **REMANDED** for further proceedings. Ledbetter's motion to file pages 1641–44 of Appellees' Joint Appendix under seal is **DENIED**.

---

[4] Although Ledbetter argues that this theory should not be considered a part of Ms. Huff's claims because it was first articulated in response to his motion for summary judgment, we assume without deciding that the theory is properly before us.