FILED
**United States Court of Appeals**
**Tenth Circuit**

**December 5, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

THAER MAHDI,

    Plaintiff - Appellant,

v.

SALT LAKE POLICE DEPARTMENT, a department of Salt Lake City Corporation; UNIFIED POLICE DEPARTMENT, a department of Salt Lake County; MICHAEL RAPICH, in his individual capacity as Superintendent of the Utah Highway Patrol; JED MILLER, in his individual capacity as a Utah State Trooper of the Utah Highway Patrol; JON THOMPSON, in his individual capacity as a Utah State Trooper of the Utah Highway Patrol; CHRIS SHELBY, in his individual capacity as a Sergeant of the Utah Highway Patrol; JOHN DOES 1-10, in their individual capacities as Utah Highway Patrol supervisors;

    Defendants - Appellees.

No. 21-4102

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:20-CV-00250-HCN)**
_____

Aaron C. Garrett, Nonprofit Legal Services of Utah, Salt Lake City, Utah, for Appellant.

David F. Mull, Salt Lake City Attorney's Office, Salt Lake City, Utah, for Appellee Salt Lake Police Department.

Scott Young, Snow, Christensen & Martineau, Salt Lake City, Utah, for Appellee Unified Police Department.

J. Clifford Petersen, Office of the Attorney General for the State of Utah, Salt Lake City, Utah, for Appellees Michael Rapich, Jed Miller, Jon Thompson, and Chris Shelby.

_____

Before **HARTZ**, **BACHARACH**, and **MORITZ**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Plaintiff Thaer Mahdi was an innocent bystander. A police chase ended when the fleeing armed robber crashed into Mr. Mahdi's tailor shop, where he was working at the time. Officers fired scores of bullets at the driver, and many hit the shop. The shop was badly damaged, and Mr. Mahdi was psychologically traumatized. Mr. Mahdi filed suit under 42 U.S.C. § 1983 against the Salt Lake City Police Department (SLCPD), a department of Salt Lake City Corporation; the Unified Police Department (UPD), a department of Salt Lake County; and four officers of the Utah Highway Patrol (UHP)—Superintendent Michael Rapich, Sergeant Chris Shelby, and Troopers Jed Miller and Jon Thompson. He alleges (1) that the responding officers used excessive force in violation of his right to substantive due process under the Fourteenth Amendment, and (2) that the officers' unconstitutional use of force resulted from Superintendent Rapich's failure to train and supervise his subordinates and from the defendant law-enforcement agencies' policies and customs, including their failure to properly train or supervise their employees. The defendants filed motions to dismiss Mr. Mahdi's first amended complaint for failure to state any claims. In response, Mr. Mahdi moved for leave to file a second amended

2

complaint. The United States District Court for the District of Utah denied the motion as futile and granted the defendants' motions to dismiss. It held that Mr. Mahdi had not adequately alleged that any officers violated his constitutional right to substantive due process and that in the absence of any such violation the police agencies also could not be liable under § 1983.

Mr. Mahdi appeals, challenging the dismissal of his claims and denial of his motion for leave to file a second amended complaint. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. Mr. Mahdi's constitutional right to substantive due process was not violated because the officers did not have the opportunity to deliberate (in the relevant sense of that term) before firing their weapons and he does not allege that any officer intended to harm him.

Because Mr. Mahdi challenges both the dismissal of his first amended complaint and the denial as futile of his proposed second amended complaint, we accept as true the factual allegations of both pleadings and draw all reasonable inferences in favor of the nonmoving party—here, Mr. Mahdi. *See Doe v. Woodard*, 912 F.3d 1278, 1285 (10th Cir. 2019).

## I.    FACTUAL BACKGROUND

On the morning of April 8, 2019, Harold Robinson embarked on a shooting spree that included at least two armed robberies in the greater Salt Lake City area. He led responding officers from the SLCPD, UPD, and UHP on a high-speed chase lasting some 20 minutes. During the pursuit Mr. Robinson fired multiple rounds from a rifle, sometimes aiming at police. The pursuit ended about 11:00 a.m. when Mr.

Robinson crashed into Princess Alterations, Mr. Mahdi's tailoring shop. The shop was open for business, and Mr. Mahdi was working inside.

Within seconds, at least 15 officers—employees of SLCPD, UPD, and UHP—surrounded Mr. Robinson's vehicle and began firing in his direction, discharging 196 bullets in 20 seconds.

Dozens of these bullets entered Mr. Mahdi's shop. His inventory and machines were destroyed. Further, Mr. Mahdi—who came to this country from Iraq, where he faced physical threats from insurgents after working as a tailor for the United States military—continues to suffer psychological distress because of the shooting. Now psychologically unable to enter the shop, he has been forced into premature retirement and has lost significant income.

## II.     DISCUSSION

We begin with the law governing the liability of Sergeant Chris Shelby, and Troopers Jed Miller and Jon Thompson of the UHP, three officers sued in their individual capacities who, we will assume, fired shots that hit Mr. Mahdi's business.

### A.     Qualified Immunity

The three officers raised the defense of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). To withstand a motion to dismiss based on qualified immunity, a complaint must satisfy two requirements: (1)

4

the facts alleged in the complaint must make out a violation of a constitutional right, and (2) the right at issue must have been clearly established at the time of the alleged misconduct. *See Leverington v. City of Colorado Springs*, 643 F.3d 719, 732 (10th Cir. 2011).

In this case Mr. Mahdi's claim against the officers fails to surmount the first hurdle. As we proceed to explain, his Fourteenth Amendment substantive-due-process claim does not meet the requirements established by the Supreme Court.

### B.    Fourteenth Amendment Substantive-Due-Process Claims

Claims that police officers have used excessive force are usually brought under the Fourth Amendment, which requires that law-enforcement seizures be reasonable. *See Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) ("A claim that law enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard."). But sometimes the victim has not been seized in the constitutional sense, and Mr. Mahdi has raised only a claim that he was denied his right to substantive due process under the Fourteenth Amendment. *See Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (plaintiff's claim falls under Fourteenth Amendment (and not the Fourth) when there was no "intentional acquisition of physical control" by the police (internal quotation marks omitted)).

Such claims "find their basis in the Fourteenth Amendment's protections against arbitrary government power." *Lindsey v. Hyler*, 918 F.3d 1109, 1115 (10th Cir. 2019). To bring a substantive-due-process claim of excessive force under § 1983, Mr. Mahdi must show that the complained-of action "shocks the conscience."

5

*Woodard*, 912 F.3d at 1300. "[O]nly the most egregious official conduct" will satisfy the shocks-the-conscience test. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

In cases of alleged excessive force by a state actor, we use two different standards to apply the shocks-the-conscience test. Selection of the appropriate standard turns on whether the state actor had time to deliberate before engaging in the complained-of conduct.

When the state actor has the opportunity "to engage in actual deliberation, conduct that shows deliberate indifference to a person's life or security will shock the conscience." *Perez v. Unified Gov't of Wyandotte Cnty.*, 432 F.3d 1163, 1166 (10th Cir. 2005) (internal quotation marks omitted). But if there is no such opportunity, conduct will shock the conscience only if it is done with the intent to harm the injured party. *Id.* Mr. Mahdi proposes that we apply the deliberate-indifference standard in his case. We disagree.

*Time to engage in actual deliberation* means time to *really* deliberate. *Actual deliberation* means "more than having a few seconds to think." *Id.* at 1167. It "do[es] not mean 'deliberation' in the narrow, technical sense in which it has sometimes been used in traditional homicide law." *Lewis*, 523 U.S. at 851 n.11. Rather, it implies "the luxury . . . of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.* at 853. Thus, there are two elements to the requisite deliberation. The first is time—time for "unhurried judgments" and "repeated reflection." The other is the opportunity for

6

attention—with no substantial "pulls of competing obligations." In other words, the intent-to-harm standard "is not limited to situations calling for split-second reactions"; instead, it applies more broadly to scenarios where state actors make decisions "in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation." *Perez*, 432 F.3d at 1167 (internal quotation marks omitted). "[W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness" will not shock the conscience. *Lewis*, 523 U.S. at 853.

In *Lewis* the Supreme Court applied this analysis to a police chase. While responding to a call about a fight, a deputy "saw a motorcycle approaching at high speed." *Id.* at 836. The operator of the cycle refused to stop in response to the deputy's commands and warning lights and sped off. *See id.* at 836–37. The chase proceeded at speeds up to 100 miles per hour. *See id.* at 837. The motorcycle crashed, killing the passenger, whose estate brought suit. *See id.* The Court noted that the deputy had to act quickly while facing competing obligations: "A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to all those within stopping range, be they suspects, their passengers, other drivers, or bystanders." *Id.* at 853.

Thus, we apply the intent-to-harm standard to resolve substantive-due-process issues arising from police motor-vehicle pursuits. *See id.* at 854 ("[H]igh-speed chases with no intent to harm suspects physically or to worsen their legal plight do

7

not give rise to liability under the Fourteenth Amendment, redressable by an action under § 1983."). There may be police-chase cases in which the deliberate-indifference standard applies—and we do not rule out the possibility—but we are aware of none.

Mr. Mahdi argues that the responding officers and their supervisors at headquarters had an opportunity for actual deliberation. Although officers opened fire on Mr. Robinson just one or two seconds after arriving on the scene, Mr. Mahdi argues that officers during the 20-minute pursuit could (and should) have been deliberating "about how to proceed at the conclusion of the chase." Aplt. Br. at 13. But Mr. Mahdi does not plead that any officer had sufficient information to predict that the chase would end with Mr. Robinson crashing into the premises of an open business. Perhaps that was one reasonable possibility; but officers pursuing an armed suspect at high speed while facing gunfire cannot reasonably be expected to simultaneously consider and plan for all reasonably possible outcomes. Besides the obvious time constraints, officers pursuing a suspect who is shooting at them must focus on the immediate threats. They are certainly subject to the "pulls of competing obligations" that preclude the luxury of deliberation. *Lewis*, 523 U.S. at 853. The officers' decision to open fire following the crash was a direct response to the circumstances they faced at that particular moment. They had only one or two seconds after arriving on scene to act and, as a matter of law, two seconds is inadequate for "unhurried judgments [and] repeated reflection." *Id.* As for supervisors at headquarters, they may not be burdened by the moment-to-moment

8

decisionmaking necessary while engaged in the pursuit; but they would be burdened by the lack of reliable information concerning ongoing events and the locations of the officers under their command. They, too, could not anticipate how the chase would end or create a decision tree addressing all reasonably possible scenarios, much less communicate it to over 15 officers engaged in the pursuit.

Mr. Mahdi relies on our opinion in *Waugh v. Dow*, 617 F. App'x 867 (10th Cir. 2015), to argue that the officers had time to deliberate, but this reliance is misplaced. We need not decide whether to endorse the nonprecedential opinion in that case, because the case before us is readily distinguishable. The plaintiff in *Waugh* brought a substantive-due-process action after he was shot by a private citizen whose brother, a sheriff's deputy, armed and recruited him to help find and arrest the plaintiff. *See id.* at 869–70. The deputy said that he had only three minutes to deliberate before arming his brother, but there was evidence suggesting that the time between the dispatch call and the deputy's decision to provide his brother with a firearm may have been closer to 24 minutes. *See id.* at 873. Also, during that time the deputy was not preoccupied with a dangerous chase. Our determination in *Waugh* that the officer may have had 24 minutes in which to deliberate hardly supports the inference that the officers here had a similar opportunity to deliberate. Indeed, *Waugh* explicitly distinguished the facts of that case from a situation in which a police officer "engages in a high-speed pursuit of another vehicle—the paradigmatic example of the absence of actual deliberation." *Id.* at 874.

9

Mr. Mahdi also argues that the court should apply the deliberate-indifference standard rather than the intent-to-harm standard because the police chase "ended" after Mr. Robinson crashed his truck into Mr. Mahdi's shop, leaving Mr. Robinson "effectively subdued" and eliminating the urgency that justifies application of the intent-to-harm standard. Aplt. Br. at 12. He invokes *Plumhoff*, where the Court held that there had been no constitutional violation but noted that it "would be a different case if petitioners had initiated a second round of shots after an initial round had clearly incapacitated [the suspect] and had ended any threat of continued flight, or if [the suspect] had clearly given himself up." 572 U.S. at 777. But *Plumhoff* is of only limited relevance here because it was a Fourth Amendment case, reviewing the use of force only for reasonableness. *See id.* at 774. More importantly, this is not the hypothetical "different case" contemplated by *Plumhoff*. Nothing in Mr. Mahdi's complaints supports an inference that Mr. Robinson had been "subdued." He had a firearm with him as he was driving, and he had shot at pursuing police officers. There is no allegation that he had indicated he was surrendering or was rendered dead or unconscious by the crash. And, in a statement in the memorandum decision and order that was not challenged on appeal, the district court said that a bystander video of the shooting (which the parties agreed to have the district court consider in resolving the motion to dismiss) "makes clear that Mr. Robinson was not incapacitated by the crash." *Mahdi v. Salt Lake City Police Dep't*, 550 F. Supp. 3d 1193, 1200 (D. Utah 2021). The court said that the video shows that Mr. Robinson "was able to get out of his car." *Id.* It also said that the video showed that after the shooting stopped the

10

officers still "remained in high alert as they cautiously approached Mr. Robinson's truck with weapons drawn," and that they showed their concern about there being another shooter in the vehicle when, "after quickly opening the [passenger-side] door, the officers jumped back defensively." *Id.* If there is any relevant language in *Plumhoff*, it is the statement that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." 572 U.S. at 777.

Mr. Mahdi next argues that even should we find that the intent-to-harm standard applies, his proposed second amended complaint states a cause of action because the extent of force used by the responding officers "indicates a vengeful, vindictive, or otherwise malicious intent to harm that goes well above and beyond the legitimate objective of arrest" and that "it does not matter that [he] was not the target of arrest." Aplt. Br. at 15. He suggests that the officers' intent to improperly harm Mr. Robinson was clear and that this intent should suffice for liability here.

Our precedent, however, requires that the intent to harm be directed at the plaintiff, not a third person. In *Childress v. City of Arapaho*, 210 F.3d 1154, 1155 (10th Cir. 2000), the plaintiffs were carjacked by two escaped prisoners who then held plaintiffs hostage. Attempting to capture and arrest the prisoners, police fired at the vehicle and inadvertently struck the plaintiffs. *See id*. at 1155–56. We held that the plaintiffs had no Fourth Amendment claim because the officers' intent was to seize the vehicle and the fugitives, not the plaintiffs. *See id*. at 1157. We also concluded that the defendants did not violate the plaintiffs' Fourteenth Amendment

11

rights because they did not have the intent to hurt the hostages. *See id.* at 1157–58. We do not foreclose the possibility that in some exceptional circumstances (shooting at someone in a parade?) an innocent bystander inadvertently harmed by force directed at a suspect could have a cause of action under § 1983. But this is certainly not one of them. S*ee id.* at 1158 ("Nowhere do plaintiffs present specific facts suggesting that the officers harbored an intent to harm *them*. Thus, there is no constitutional liability under *Lewis*." (emphasis added)); *Perez*, 432 F.3d at 1168 ("[A] bystander hit by an emergency response vehicle in the process of responding to an emergency call cannot sustain a claim under the substantive due process clause without alleging an intent to harm [the bystander]."); *Radecki v. Barela*, 146 F.3d 1227, 1232 (10th Cir. 1998) (survivors of innocent bystander killed during police-suspect struggle have no Fourteenth Amendment claim because they did not allege that defendant officer acted with intent to harm the bystander); *cf. Huff v. Reeves*, 996 F.3d 1082, 1088 (10th Cir. 2021) (distinguishing *Childress* by noting, "*Childress* would be highly relevant, indeed dispositive, if the evidence established that [defendant] was shooting only at [the suspect] and the wounds to [plaintiff] were just the unfortunate accidental effects of otherwise lawful conduct." (ellipsis and internal quotation marks omitted)).

We conclude that Mr. Mahdi was required to, but did not, allege that the officers intended to harm him. Therefore, neither his first nor his second amended complaint states a claim of a violation of his substantive-due-process rights.

### C.     Supervisory and Municipal Liability

There remain the claims against UHP Superintendent Rapich and the two local law-enforcement agencies. But those claims fall away once it is determined that none of the officers on the scene violated Mr. Mahdi's substantive-due-process rights.

Mr. Mahdi's complaints do not allege that Superintendent Rapich played any role in the actual pursuit of Mr. Robinson. He is sued for his failure to properly train and supervise his subordinate officers. But a supervisor cannot be held liable for deficiencies in training and oversight if his subordinates did not violate the plaintiff's constitutional rights. *See Martinez v. Beggs*, 563 F.3d 1082, 1092 (10th Cir. 2009).

As for the law-enforcement agencies, we assume that Mr. Mahdi did not sue UHP itself because it enjoys sovereign immunity as a state agency. *See Pettigrew v. Oklahoma ex rel. Okla. Dep't of Pub. Safety*, 722 F.3d 1209, 1212 (10th Cir. 2013) (state department of public safety "is an arm of the State of Oklahoma and therefore is treated as the state for purposes of sovereign immunity and the Eleventh Amendment"). SLCPD and UPD, however, are suable as municipal entities. *See Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007) ("Eleventh Amendment immunity extends to states and state entities but not to counties, municipalities, or other local government entities.").[1] But ordinarily a plaintiff cannot recover "against a municipal corporation based on the actions of one of its officers

---

[1]The district court noted that the proper defendants should have been the Salt Lake City Corporation, rather than SLCPD, and probably Salt Lake County, rather than UPD, but did not need to resolve that issue. *See Mahdi*, 550 F. Supp. 3d at 1196 n.1.

when . . . the officer inflicted no constitutional harm." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *see also Crowson*, 983 F.3d at 1191–92 (absent indication of a systemic failure, municipal liability requires violation of an individual's constitutional rights by one or more municipal officers). The district court dismissed Mr. Mahdi's claims against SLCPD and UPD because Mr. Mahdi failed to allege a constitutional violation by any police official. In his opening brief Mr. Mahdi fails to respond to this conclusion, neither raising nor arguing theories for imposing liability on the two agencies under § 1983. We therefore have no occasion to consider whether there might be some theory supporting their liability despite the absence of any constitutional violation by an officer. *See Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1266 (10th Cir. 2004) ("Issues not raised in the opening brief are deemed abandoned or waived." (internal quotation marks omitted)).

## III.    CONCLUSION

We **AFFIRM** the district court's order dismissing Mr. Mahdi's Fourteenth Amendment claims and denying his motion for leave to file a second amended complaint.