**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT
_____

**July 5, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

LISA G. FINCH; DOMINICA C. FINCH;
as co-administrators of the Estate of
Andrew Thomas Finch, deceased,

   Plaintiffs - Appellees,

v.

JUSTIN RAPP,

     Defendant - Appellant,

and

CITY OF WICHITA, KANSAS;
BENJAMIN JONKER,

   Defendants.

No. 20-3132

LISA G. FINCH; DOMINICA C. FINCH;
as co-administrators of the Estate of
Andrew Thomas Finch, deceased,

   Plaintiffs - Appellants,

v.

CITY OF WICHITA, KANSAS,

     Defendant - Appellee,

and

JUSTIN RAPP; BENJAMIN JONKER,

   Defendants.

20-3190

———————————————————————

**Appeals from the United States District Court
for the District of Kansas
(D.C. No. 6:18-CV-01018-JWB)**

———————————————————————

Samuel A. Green (J. Steven Pigg, with him on the briefs) Fisher, Patterson, Sayler & Smith, L.L.P., Topeka, Kansas, for Defendant-Appellant, Defendants and Defendant-Appellee.

Easha Anand, MacArthur Justice Center, San Francisco, California (Andrew M. Stroth and Carlton Odim, Action Injury Law Group, LLC, Chicago, Illinois, Alexa Van Brunt and David M. Shapiro, MacArthur Justice Center, Chicago, Illinois, Jason C. Murray, Bartlit Beck LLP, Denver, Colorado, Hamilton H. Hill, Bartlit Beck LLP, Chicago, Illinois, Rick E. Bailey, Wichita, Kansas, and Devi Rao, MacArthur Justice Center, Washington, D.C., with her on the briefs), for Plaintiffs-Appellees and Plaintiff-Appellants.

———————————————————————

Before **TYMKOVICH**, Chief Judge, **LUCERO**, Senior Circuit Judge, and **MORITZ**, Circuit Judge.

———————————————————————

**TYMKOVICH**, Chief Judge.

———————————————————————

This appeal arises from a case of "swatting" with a tragic end.  Swatting involves placing a hoax emergency call reporting serious threats to provoke an armed law enforcement response to an individual's residence, usually as an act of harassment or revenge.  After Wichita police received a seemingly legitimate call, officers had to make a split-second decision based on fraudulent threats and reports of violence.  Unfortunately, that swatting call and the subsequent reaction from police resulted in an innocent man's death.

2

A 911 call led police officers to believe they were responding to a deranged man who had just killed his father and was holding the rest of his family hostage at gunpoint. Wichita Police Officer Justin Rapp, along with numerous other officers, rushed to Andrew Finch's house, where the caller claimed to have committed the crimes. But Finch had not committed any crime and had no way of knowing why police were surrounding his home. As Finch exited the house, multiple officers yelled different commands. Ten seconds later, Officer Rapp thought he saw Finch reaching for a weapon and shot him in the chest. Finch did not survive.

Finch, through his next of kin, brought a lawsuit under 42 U.S.C. § 1983 against (1) Officer Rapp for excessive force in violation of the Fourth Amendment, (2) Sergeant Benjamin Jonker for supervisory liability for Rapp's constitutional violation, and (3) the City of Wichita for municipal liability due to its alleged practices of using excessive force and inadequate disciplinary procedures. The district court granted summary judgment against Finch on the claims against Jonker and the City of Wichita but denied summary judgment as to Officer Rapp. Finch appealed the grant of summary judgment to the City, and Rapp appealed the denial of qualified immunity.

The district court held that a reasonable jury could find that Finch was unarmed and unthreatening. We are bound by those findings for the purposes of this appeal. Thus, the claims against Officer Rapp can go forward. The claims against the City were properly resolved. The district court correctly found that Finch did not put forth sufficient evidence to prevail on his municipal liability claim against the City.

3

We therefore **AFFIRM** the district court's denial of summary judgment as to Officer Rapp and **AFFIRM** the district court's grant of summary judgment as to the City of Wichita.

## I.     Background

### A.  The Shooting

At 6:10 p.m. on December 28, 2017, a City of Wichita service officer answered a call.  The caller stated his mother had struck his father with a gun.  The service officer attempted multiple times to connect the caller to 911 but the call dropped repeatedly.  Seven minutes later, the caller gave his number to the officer, who passed along the information to the Sedgwick County 911 dispatchers.  At 6:18 p.m., a 911 dispatcher contacted the caller.  This time, the caller told the dispatcher he had shot his father in the head and was holding his mother and brother at gunpoint in a closet.  He gave the dispatcher an address in a residential Wichita neighborhood.  The dispatcher transmitted alerts to officers that the caller had shot his father and was holding his mother and brother at gunpoint.  The dispatcher also reported that the caller was threatening to light the house on fire and commit suicide.

Unbeknownst to the officers and dispatcher, the caller was a Los Angeles resident who had no connection to the Wichita address or its residents, one of whom was Andrew Finch.  The call was a false swatting call.  The caller was a serial "swatter," and he made the call on behalf of a Call of Duty player who wanted to retaliate against another player after a virtual altercation in the videogame.  But none of the video game players actually lived in Wichita.  The caller was given a false address, which happened to be for Finch's

residence. Finch had no connection to the caller or the online altercation. He was at home with his mother, his sister, his niece, and two family friends.

As a result of the 911 call, numerous officers rushed to Finch's address, believing there was a barricaded shooter scenario with hostages. By that time, the December sun had set, and it was dark outside. The first officers on the scene parked and approached the east side of the house on foot, walking through the yards between the houses as additional officers arrived on the west side. The four officers east of the house could discern other officers to the north and the west of the house and patrol vehicles blocking traffic on the street.

Wichita Police Sergeant Benjamin Jonker arrived and parked southwest of the house. He noticed he was the only supervisor present, so he assumed he was in command. Wichita Police Officers Justin Rapp and Matthew Powell also arrived southwest of the house. Rapp and Powell were members of a special team that regularly responded to high-risk incidents. Rapp carried a rifle, which he was certified to use from a distance of up to fifty yards. Another officer on the scene told Rapp that, based on movement seen in the upstairs window of the residence, someone was performing CPR inside the house. After noticing there were no exits on the west side of the house, Jonker directed Rapp and Powell to follow him to the front door on the north side of the house.

Once they were at the north side of the residence, Jonker told Rapp to be "long cover" since Rapp had a rifle. Rapp, who had been an officer for seven years, understood his duty as a cover officer was to look out for the safety of everyone in the vicinity. Rapp positioned himself about forty yards from the entrance of the house. Powell was within

5

an arm's distance on Rapp's right and Jonker was a little farther to the right.  Due to the darkness, Rapp could not see the officers on the east side of the residence, who had moved to a location about forty-five feet away from the residence's front door.

Rapp had only been in his position about forty seconds when Finch opened his front door.  Finch pushed the screen door open and took a step out onto the porch.  An officer on the east side of the residence turned his rifle light on and instructed Finch to put his hands up and step off the porch.  Jonker yelled "show your hands!"  At the same time, officers to the east of the house shouted other commands.  Jonker then yelled "walk this way!"  Officers later testified that they could not understand the commands being given by Jonker at the north side.  None of the officers identified themselves as police.

Finch stood on the porch.  He initially appeared to comply with officer commands, raising his hands up to about ear level.  Officers, including Rapp, could see Finch was not holding anything in his hands.  Finch then began to lower his hands.

There is conflicting testimony about what happened during the next few seconds.  Some officers testified Finch raised his hands and lowered them a second time while moving back towards the doorway threshold.  One officer testified he saw nothing indicating Finch was a threat to the officers, but he lost sight of Finch once Finch backed up into the doorway.  Another officer, also located to the east of the house, testified that Finch moved his hand towards the small of his back and moved back into the doorway.  The officer was not sure whether the movement was threatening or just Finch steadying himself.  A third officer at the east side believed Finch was reaching for a weapon when he saw Finch put his hands back down.

On the north side, an officer saw Finch reach back with his right hand and place it on the front doorknob. Jonker saw Finch lower his hand and then start to raise his hands in response to the commands. But Jonker was primarily focused on officers on the east side, not on Finch. Rapp saw Finch grab the right side of his hoodie and lift it up, making a motion that appeared as if he was drawing a firearm. Rapp thought Finch was not complying with commands and possibly was armed. He testified he thought he saw a gun in Finch's hand.

Approximately ten seconds after Finch first opened the door and stepped onto the porch, Rapp fired a single shot from his rifle, hitting Finch in the chest. Finch fell backwards into the residence, where he died within minutes. He was not armed. Shortly after, police realized there had been no hostage situation or murder at the residence.

**B. The Aftermath**

After the shooting, the 911 caller was arrested and charged with involuntary manslaughter and other crimes. He pled guilty and was sentenced to 240 months in prison.

Following the protocol for any officer-related shooting, the police department and City of Wichita conducted a criminal investigation in conjunction with the Kansas Bureau of Investigation. The Sedgwick County District Attorney then determined whether criminal charges should be filed against the officers. Following the investigation, the district attorney declined to prosecute Rapp for his actions. Next, the Wichita Police Department's Professional Standards Bureau conducted the administrative investigation. It exonerated Rapp for the shooting.

### C.  Procedural Background

Finch, through his next of kin, filed a 42 U.S.C. § 1983 suit against Rapp, Jonker, and the City of Wichita, bringing (1) an excessive force claim against Rapp, (2) a supervisory claim against Jonker, and (3) a municipal liability claim against the City of Wichita.  The defendants moved for summary judgment, and Rapp raised a qualified immunity defense.  The district court granted summary judgment on the claims against Jonker and the City of Wichita but denied summary judgment and the qualified immunity defense as to Rapp.  Rapp filed an interlocutory appeal of the denial of qualified immunity, and Finch appealed the final summary judgment entered in favor of the City of Wichita.

## II.    Discussion

Rapp claims a reasonable officer could believe Finch posed a threat of serious physical harm and therefore qualified immunity should apply.  But based on the district court's findings of fact, Finch could not have posed a threat and Rapp was not entitled to qualified immunity.  Finch claims the City of Wichita's investigatory and disciplinary policies following use-of-force incidents lacked accountability, reflected deliberate indifference, and caused Finch's death.  But he failed to support his allegations with any evidence of such a policy.  For the reasons below, we affirm both of the district court's rulings.

### A.  Standard of Review

On an interlocutory appeal of a denial of qualified immunity, we can review only questions of law—"we are not at liberty to review a district court's factual conclusions."

8

*Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008). So we cannot, at this stage in the proceedings, review the district court's findings that Finch was unarmed and unthreatening. Instead, we must accept all such inferences as true for the purposes of this interlocutory appeal. We only review the district court's legal conclusions that the facts, in the light most favorable to Finch, establish a clear violation of the Fourth Amendment, and Rapp therefore was not entitled to qualified immunity.

Qualified immunity involves a two-part inquiry. *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007). First, the plaintiff must establish the defendant violated a constitutional right. If no constitutional violation is established by the plaintiff's allegations or the record, our inquiry ends. But if a constitutional right was violated, we ask if the constitutional right was clearly established. To be clearly established, a constitutional right must be confirmed by Supreme Court or Tenth Circuit precedent or the overwhelming weight of authority from other courts. *Id.* at 1114–15. On this interlocutory appeal of qualified immunity, we can consider only "(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation." *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013).

**B. Constitutional Violation—Excessive Force**

The Fourth Amendment prohibits state and federal governments from making unreasonable seizures. U.S. Const. amend. IV. Excessive force claims are "analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). That standard asks whether the police employed objectively

9

reasonable force given the totality of the circumstances. *See Thomson v. Salt Lake City*, 584 F.3d 1304, 1313 (10th Cir. 2009). This inquiry pays "careful attention to the facts and circumstances of each particular case." *City of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (quoting *Graham*, 490 U.S. at 396).

In *Graham*, the Supreme Court identified three factors a court should consider when evaluating a claim that police officers used excessive force: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

Accepting the district court's factual determinations, as we must, we find that the district court did not err in denying summary judgment in favor of Finch. The district court concluded that a reasonable jury could find that (1) Rapp fired a shot when he could see Finch's hands were empty, (2) Rapp's assertion that Finch made a threatening motion was false, and (3) Rapp could not see Finch's movements clearly due to darkness and distance, along with numerous other facts.[1] Thus, it found that a reasonable jury could also conclude Rapp did not reasonably believe Finch posed a threat.

---

[1] The district court concluded a reasonable jury could find: (1) Finch was confused but attempted to comply with officers' commands and his movements did not indicate hostile or threatening action; (2) persons yelling at Finch were not immediately recognizable as police; (3) Finch simply moved his arms when officers were giving him multiple commands; (4) Finch's movements did not suggest he was attempting to draw a firearm; (5) Finch was never told to keep his hands up in the air or that he would be shot; (6) an officer could see Finch was not actively resisting commands; and (7) Rapp was unaware Finch was attempting to go back into the house when Finch was shot.

Rapp now argues we are not bound to accept the district court's determination of what a reasonable jury could find. But an appeals court may deviate from its usual deference and review an interlocutory appeal of summary judgment *de novo* in only three circumstances: (1) the district court failed to identify the particular charged conduct it deemed as supported by the record, (2) the district court's account of facts is "blatantly contradicted by the record," or (3) the reasonable factual inferences arise during the motion to dismiss stage. *Lewis v. Tripp*, 604 F.3d 1221, 1226 (10th Cir. 2010). These exceptions do not apply here.

Rapp argues the district court ignored video evidence that "blatantly" contradicts the court's findings. *See Lewis*, 604 F.3d at 1226. But nothing in the video footage offered by Rapp indisputably contradicts the district court's findings that Finch's motions "did not reasonably suggest he was attempting to draw a firearm" and Finch did not "pose[] a threat of serious physical harm to others." Aplt. App., Vol. IV, at 1019. In the video, we see Finch raise his hands—but there is nothing that could "blatantly contradict" the conclusion his actions were nonthreatening. *Estate of Valverde v. Dodge*, 967 F.3d 1049, 1062 (10th Cir. 2020).

Rapp also argues that the district court erred by focusing on the testimonies of other officers located at different perspectives than Finch. But the various conflicting testimonies of other officers are relevant to whether a jury could find that Rapp reacted reasonably for an officer in his position—they demonstrate a genuine issue of material fact. Whether Rapp reasonably believed Finch presented any threat is a genuine issue of fact for the jury to determine.

11

### C. Clearly Established

Having found a constitutional violation, the district court correctly denied

qualified immunity because Rapp's action violated clearly established law. A "clearly

established right is one that is sufficiently clear that every reasonable official would have

understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7 (2015)

(cleaned up). As a result, qualified immunity "protects all but the plainly incompetent or

those who knowingly violate the law." *Id.* (citations omitted). Although we do not

"require a case directly on point, . . . existing precedent must have placed the statutory or

constitutional question beyond debate." *Id.* (cleaned up).

For a law to be clearly established, it must not be defined "at too high a level of

generality." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021). The "rule's contours

must be so well defined that it is 'clear to a reasonable officer that his conduct was

unlawful in the situation he confronted.'" *District of Columbia v. Wesby*, 138 S. Ct. 577,

590 (2018) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). This is "'especially

important in the Fourth Amendment context,' where it is 'sometimes difficult for an

officer to determine how the relevant legal doctrine, here excessive force, will apply to

the factual situation the officer confronts.'" *Bond*, 142 S. Ct. at 11 (quoting *Mullenix*,

577 U.S. at 12).

In determining whether the law was clearly established, the district court included

"inferences that Rapp could see Finch did not have a firearm, that Finch did not make any

movement like he was drawing a firearm . . . and [that] Finch made no motion indicating

he was about to shoot." Aplt. App., Vol. IV at 1023. The district court relied on four

12

cases to determine that the right not to be subjected to deadly force was clearly established. *Zuchel v. Spinharney*, 890 F.2d 273 (10th Cir. 1989); *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150 (10th Cir. 2010); *Walker v. City of Orem*, 451 F.3d 1139, 1157 (10th Cir. 2006); *King v. Hill*, 615 F. App'x 470 (10th Cir. 2015). Taken together, these cases establish a constitutional right so clearly established that "every reasonable official would have understood that what he [was] doing violates that right." *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018) (quoting *Mullenix*, 577 U.S. at 11).

First, in *Zuchel v. Spinharney*, police approached a man having a confrontation with a group of teenagers. 890 F.2d 273. One of the teenagers yelled that the man had a knife as the man turned around and approached the officers. An officer shot the man four times. The man had only been holding a pair of fingernail clippers. The court denied qualified immunity.

In *Zia Trust Co. ex rel. Causey v. Montoya*, police responded to a report of a dispute between a caller and his adult son, who had mental health issues. 597 F.3d 1150. The dispatcher reported that there were firearms at the residence. The officer arrived at the residence and saw the suspect sitting in a van. The man allegedly pointed the wheels of the van at the officer. The officer fired a single shot into the van and killed the suspect. The court affirmed the denial of qualified immunity.

In *Walker v. City of Orem*, police officers reported to the residence of an individual who they had been told was suicidal and "en route to cause harm to his family." 451 F.3d at 1157. It was reported that the suspect was unarmed. When the

police arrived, the suspect held a box cutter to his wrist. An officer shot the suspect and a second officer shot two more rounds. The district court denied qualified immunity, finding that the suspect did not pose a threat and was not moving toward anyone.

Finally, in *King v. Hill*, a nonprecedential case, officers received a report about a mentally ill man making threats against his spouse. 615 F. App'x at 471. Despite testimony that the man did not have anything in his hands, an officer shot him with a rifle after the man yelled at the officers to get off his property and threatened them. *Id.* at 472. The court relied on *Tennessee v. Garner* for the established principle that an "officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id.* (citing 471 U.S. 1 (1985)).

In the most factually similar Tenth Circuit case, *Huff v. Reeves*, 996 F.3d 1082, 1086 (10th Cir. 2021), officers responded to a report of a bank robbery where an individual had been shot and the robber had taken a female hostage. After a police chase, the suspect's car stopped. The hostage exited and was shot by police officers while running towards the officers with her hands in the air, in a surrendering pose. The court concluded that although there are no cases that address the "precise set of facts," shooting the hostage while she posed no threat of harm to the officers violated clear precedent in this circuit. *Id.* at 1091. *Huff* was decided after the events in this case occurred, so it cannot establish that Rapp should have known his conduct was unlawful. But it is instructive as to the analysis of whether Rapp's conduct violated a clearly established right based on our caselaw.

14

To be sure, there is no case with identical facts to those here. But "[w]e do not think it requires a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself." *Zia Tr. Co.*, 597 F.3d at 1155 (quoting *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008)). Taken together, the cases relied on by the district court establish that an officer, even when responding to a dangerous reported situation, may not shoot an unarmed and unthreatening suspect. *See King*, 615 F. App'x at 479 (finding it "clearly established that an officer could not shoot an unarmed man who did not pose any actual threat to the officer or to others"); *Zia Tr. Co.*, 597 F.3d at 1155 (finding it clearly established that an officer could not shoot a suspect without "a serious threat of physical harm"); *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006) (finding it clearly established that an officer could not shoot a suspect who "was not charging the officer and had made no slicing or stabbing motions toward him"); *see also Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) (finding it clearly established that an officer could not shoot a suspect with a sniper rifle unless "the suspect presents an immediate threat to the officer or others"). A jury could find Rapp shot Finch even when a reasonable officer would have known Finch was unarmed and posed no threat. Thus, viewing the facts in the light most favorable to Finch, Rapp violated clearly established law.

### D. *Municipal Liability*

The district court also granted summary judgment on Finch's municipal liability claims against the City of Wichita. Finch claims that the City is liable for his death

15

because its policies directly caused Rapp to employ lethal force.  According to Finch, two City policies caused his death: (1) the City's inadequate investigative and disciplinary process following police-involved shootings and (2) its custom of using lethal force on unthreatening civilians.

A municipality is not directly liable for the constitutional torts of its employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Thus, even if Rapp is found to have committed a constitutional violation, it does not necessarily follow that the City of Wichita, his employer, could be sued for that violation.  But the City may be held liable under *Monell* if it executes an unconstitutional policy or custom, or a facially constitutional policy that causes a constitutional violation.  *Id.*  Here, Finch alleges no unconstitutional policy or custom, so we ask if the policies he does allege caused a constitutional violation.

To prove such a *Monell* claim, a plaintiff must first show a municipal policy or custom—either an official rule or one so entrenched in practice as to constitute an official policy.  *Id.*  Next, a plaintiff must show that the municipality was deliberately indifferent to constitutional violations that were the obvious consequence of its policy.  *See Crowson v. Washington County*, 983 F.3d 1166, 1188 (10th Cir. 2020) (collecting Tenth Circuit cases on the deliberate indifference requirement).  To demonstrate that a municipality acted with deliberate indifference, a plaintiff may show that the municipality had "actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation" and "consciously or deliberately [chose] to disregard the risk of harm."  *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).  Notice can be

16

established through a "pattern of tortious conduct" or "if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction." *Id.* at 1308 (quoting *Brown*, 520 U.S. at 409, 411). Finally, a plaintiff must show that the policy directly caused his constitutional injury. *See Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (requiring "a direct causal link" between the policy and the constitutional violation). A plaintiff can establish a direct causal link only by showing that the municipal practice was closely related to the deprivation of rights.

Finch claims that the City is liable for two widespread Wichita Police Department practices that amount to official policy. First, he alleges that the Department's investigatory and disciplinary practices were so meager that they amounted to a policy of inaction in response to excessive force incidents. His evidence shows a policy of light discipline—reprimand or one-day suspension—in response to Department policy violations generally, not in response to excessive force incidents. Second, he alleges that officers had a practice of using excessive force by shooting unthreatening civilians. But most of the evidence Finch presents is not relevant to the alleged policy of excessive force.

*First*, Finch claims that the City's investigative and disciplinary process following use-of-force incidents is inadequate. He especially takes issue with the Department's use of interviews and evidence conducted by the District Attorney's Office. This reuse means the Department rarely conducts its own interviews. Further, the Department sometimes relies on the already gathered evidence to make credibility determinations or resolve conflicting narratives. Finch argues that this practice makes the investigatory

process less reliable and that this "policy" of inadequate investigation and discipline caused his shooting.

The City's process is as follows: After a police-involved shooting, the City performs a criminal investigation, coordinated with the Kansas Bureau of Investigation. The District Attorney observes the investigation, considers the evidence, and independently decides whether to file charges against an officer. After the criminal investigation, the Wichita Police Department's Professional Standards Bureau conducts an administrative investigation to determine whether Department policy was violated and whether internal discipline is appropriate. The Professional Standards Bureau uses the evidence gathered in the criminal investigation, unless external evidence is necessary. Thus, it often does not conduct its own interviews, instead reviewing the documents and interviews conducted during the criminal investigation. The Department then imposes necessary discipline—generally reprimand, suspension, or termination.

*Second,* Finch alleges that Police Department officers had a custom of shooting unthreatening suspects.[2] In support, he cites police-involved shootings that occurred over the six years preceding the incident with Finch. But Finch does not argue that all of the more than 20 shootings he cites constituted excessive force. Instead, he points to only a

---

[2] We note that there is no need for a plaintiff to provide evidence of successful constitutional litigation to prove a municipal liability claim. To the extent the district court's order is read that way, it misstated the proof necessary for a *Monell* claim. *See Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993) (requiring proof of "[t]he existence of a continuing, persistent and widespread practice of unconstitutional misconduct"); *see also Waller v. City of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019). But a plaintiff must provide evidence of a pattern of *relevant* conduct—here, the use of excessive force on unthreatening civilians.

handful of police-involved shootings that "[a] jury could conclude . . . were unconstitutional." App. Br. at 59. These alleged constitutional violations have widely varying facts and lack a common theme or pattern. Some do not involve excessive force. Even assuming the subset of cases drawn from the six-year period were constitutional violations, they are isolated when considered in the circumstances presented in this case.[3]

*Third,* even if Finch successfully alleged that the Department had a policy or custom of inadequate investigation and discipline, he could not prove causation. Finch cannot meet the "rigorous standards of culpability and causation" necessary to prove a municipal liability claim. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (quoting *Brown*, 520 U.S. at 398). At best, he alleges that the City had policies of (1) reusing evidence from its criminal investigations in its administrative investigations, and (2) imposing relatively minor discipline in response to

---

[3] Three cases do not necessarily constitute a pattern of excessive force, contrary to Finch's argument. *Quintana v. Santa Fe County Board of Commissioners*, 973 F.3d 1022, 1034 (10th Cir. 2020), does not require us to find three incidents are sufficient. That case was at the more lenient motion-to-dismiss stage, which we emphasized constituted "a low bar." *Id.* Further, there were more than three incidents alleged there. In *Quintana*, the decedent allegedly never received withdrawal medication even though prison staff acknowledged that he was going through withdrawal when he entered the jail. He alleged that three other inmates had "recently" died from drug withdrawals. He pointed to a DOJ study warning the county of its inadequate medical screening procedures. He finally alleged that he had deficient intake procedures over the *eight* previous times he was incarcerated at the facility. In *Quintana*, the plaintiff offered proof of many more than three incidents. Thus, the case cannot stand for the proposition that three incidents necessarily establish a pattern of unconstitutional conduct for the purposes of *Monell* liability.

Department policy violations. Neither policy would directly result in a constitutional violation in the swatting incident we address in this appeal.

To defeat this conclusion, Finch argues that "[a] failure to investigate or reprimand might . . . cause a future violation by sending a message to officers that such behavior is tolerated." Aple. Br. at 67 (quoting *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009)). But he does not explain how a failure to respond to minor policy violations could send a message that dissimilar conduct, like the use of lethal force in this case, is tolerated. Thus, his arguments do not meet the demanding standard of causation that we require in *Monell* cases, namely the "direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404.

In sum, Finch has failed to show any deliberately indifferent policies or customs that caused Rapp to use excessive lethal force. Because he has failed to provide any evidence of a viable municipal liability claim, we affirm the district court's order granting summary judgment for the City.

## III.    Conclusion

For the foregoing reasons, we **AFFIRM** the district court's denial of summary judgment as to the claims against Officer Rapp and **AFFIRM** the district court's grant of summary judgment as to the claims against the City of Wichita. We **DENY AS MOOT** Professor Seth Stoughton's motion for leave to file an amicus brief.