**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 22, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

JONATHAN LEE; ERIN LEE;
NICOLAS JURICH; LINNAEA
JURICH,

     Plaintiffs - Appellants,

and

C.L., a minor, by and through parents
Jonathan and Erin Lee as next friends;
M.L., a minor, by and through parents
Jonathan and Erin Lee as next friends;
H.J., a minor, by and through parents
Nicolas and Linnaea Jurich as next
friends,

     Plaintiffs,

v.

POUDRE SCHOOL DISTRICT R-1,

     Defendant - Appellee,

and

POUDRE SCHOOL DISTRICT R-1
BOARD OF EDUCATION,

     Defendant.

No. 24-1254

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:23-CV-01117-NYW-STV)**

_____

Richard P. Lawson of America First Policy Institute, Arlington, Virginia (Jase Panebianco, America First Policy Institute, Arlington, Virginia; J. Brad Bergford & Emily T. Davis of Illumine Legal LLC, Denver, Colorado, with him on the briefs), for Plaintiffs-Appellants.

Jonathan P. Fero of Semple, Farrington, Everall & Case, P.C., of Denver, Colorado, for Defendant-Appellee.

_____

Before **MATHESON**, **PHILLIPS**, and **McHUGH**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

Like many twelve-year-old children who attend a new school, C.L. struggled. Her homeroom teacher, Jenna Riep, noticed and began talking one-on-one with C.L. These talks included discussions about C.L.'s gender identity and her freedom to use masculine pronouns if she preferred. Despite these conversations, C.L. never questioned her gender identity. Eventually, Riep, who was also the school's art teacher, invited C.L. to an after-school art-club meeting. When C.L. arrived at the meeting, she saw that it was really a Gender and Sexualities Alliance (GSA) meeting.

The meeting featured a guest speaker, Kimberly Chambers, a substitute teacher in the district. Chambers lectured the assembled students on gender-identity issues for about ninety minutes. She said that students uncomfortable with their bodies were likely transgender and as such were more prone to suicide. She gave LGBTQ-themed prizes to students who came out as transgender during the meeting. She warned the students that it might not be

2

safe to tell their parents about the meeting, and she invited the students to communicate with her confidentially after providing them her personal contact information.

Though C.L. had not previously questioned her gender identity, she announced herself as transgender at the meeting. As C.L. was leaving, Riep again told her that she didn't have to tell her parents about the meeting. But when she got home, C.L. tearfully told her parents that she was transgender and recounted what had happened at the meeting. The next day, her parents disenrolled her from the school district. As spelled out more below, H.J., one of C.L.'s classmates, had similar experiences with Riep and Chambers at the next two after-school GSA meetings.

C.L.'s and H.J.'s parents (the Lees and the Juriches) sued the Poudre School District and its Board of Education under the Fourteenth Amendment, alleging a violation of their parental substantive-due-process rights. After the district court granted the district's motion to dismiss the complaint without prejudice, the parents moved to amend their complaint. This time they asserted a single claim against the school district for violating their parental substantive-due-process rights. They dropped their request for injunctive relief and instead sought only money damages for the cost of private schooling, medical expenses, counseling fees, damage to the parents' reputation, transportation expenses, and emotional anguish.

3

The district court denied the motion to amend the complaint after concluding that the parents had failed to plausibly allege municipal liability. We agree and hold that the parents have not plausibly alleged that the district's official policy was the moving force behind their alleged injuries. So exercising our appellate jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

### I.    Factual Background[1]

### A.    C.L. (Lee)

In fall 2020, the Lees moved to Wellington, Colorado. Their twelve-year-old daughter, C.L., enrolled at Wellington Middle-High School (WMS) as a sixth grader. C.L. struggled to make friends. Her homeroom teacher, Jenna Riep, took an interest in her, and had several one-on-one conversations with C.L. about C.L.'s gender identity. Among other things, Riep stressed to C.L. that C.L. could reject her feminine pronouns. Despite those conversations, C.L. never questioned her gender identity.

On May 4, 2021, Riep, who was also the school's art teacher, invited C.L. to an after-school meeting, describing it as being for the "GSA Art Club." App. vol. II, at 275 ¶¶ 47–49. C.L. didn't know that GSA was shorthand for Gender and Sexualities Alliance, and she agreed to attend the meeting because

---

[1] Because we are reviewing the denial of a motion to amend on futility grounds, we rely on well-pleaded factual allegations in the proposed amended complaint as construed most favorably to the parents. *See Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1217–18 (10th Cir. 2022).

she liked art. Soon after arriving, C.L. saw that the meeting wasn't about art. Instead, for ninety minutes, Kimberly Chambers, a substitute teacher in the school district, lectured the assembled students about gender identity and sexual orientation. Among other things, Chambers told the students that if they were not completely comfortable in their bodies, they were likely transgender. Her message led several students to announce during the meeting that they were transgender. For those students, Chambers awarded themed prizes, including LGBTQ-pride flags.

Though C.L. had not questioned her gender identity or experienced symptoms of gender dysphoria before this, she came out at the meeting as transgender. She did so after Chambers advised the students that transgender youth are more likely to attempt and complete suicide than their cisgender peers. Before the meeting ended, Chambers warned the students that it might not be safe to tell their parents they are transgender or about the meeting. Instead, she said that she could be trusted and gave the students her personal cell-phone number and Discord information so they could talk with her at any time.[2]

As C.L. was leaving the meeting, Riep pulled her aside and reemphasized that she shouldn't feel pressured to tell her parents about the meeting. Even so,

---

[2] Discord is an application that allows users to send voice, video, and text messages to other users. *What is Discord?*, Discord (May 12, 2022), https://discord.com/safety/360044149331-what-is-discord (last visited April 18, 2025).

C.L. told Riep that she planned to tell her mother that she was transgender because she believed that her mother would be accepting of this. In response, Riep reiterated that she didn't have to tell her mother.

When C.L. got home, she told her parents that she was transgender. That evening, the family had several stressful conversations about C.L.'s gender identity, and C.L. tearfully recounted that Riep and Chambers had warned her that it might be unsafe to come out to them. Astonished at what they had heard, the Lees disenrolled C.L. from the district the next day and enrolled her in a private school. Over the next few months, C.L. experienced suicidal thoughts and received counseling for the gender and sexuality confusion she was experiencing.

After the Lees disenrolled C.L. from attending school in the district, WMS staff internally discussed involving child-protective services to conduct a wellness check on C.L. When the Lees contacted Kelby Benedict, the WMS principal, to discuss what happened at the GSA meeting, he insisted on going to the Lee home so that, unbeknownst to the Lees, he could check on C.L. The Lees were again astonished when Benedict defended Riep and Chambers and told the Lees that students who attended GSA meetings were expected to keep the meetings confidential to ensure a safe space for open discussion.

The Lees had not known that Riep would be discussing gender-identity issues with C.L. or that Riep would solicit C.L. to attend a GSA meeting. After learning this, Ms. Lee expressed her concern to the WMS staff not only about

6

the subject matter discussed at these meetings but also about the district's policies designed to keep parents from knowing what was happening.

## B.    H.J. (Jurich)

After C.L. attended the GSA meeting, Riep invited another sixth grader, H.J., to a GSA meeting set for the next Tuesday. H.J. attended that meeting and another the following Tuesday. H.J.'s experience was like C.L.'s—H.J. was told that if she didn't like her body, she was likely transgender; that doctors or parents can misassign gender at birth; and that transgender people are more likely to commit suicide. Riep also warned H.J. that it may not be safe to talk to her parents about her gender identity and emphasized that she didn't have to tell anyone what they discussed at the GSA meetings.

After those two meetings in the spring semester of sixth grade, H.J. began suffering from suicidal ideation. Because H.J. had been told that transgender people were more likely to commit suicide, H.J. believed that her suicidal thoughts further affirmed that she must be transgender. That in turn increased the intensity of her suicidal thoughts. This cycle continued for about six months and harmed H.J.'s mental health. During this time, H.J.'s friendships with classmates deteriorated, and she became nervous about attending classes taught by Riep, who kept asking her to return to the GSA meetings. Things got so bad that H.J. asked her parents to homeschool her so she wouldn't have to go to WMS. Soon after that, H.J. attempted suicide. After receiving psychiatric treatment, H.J. re-enrolled in WMS to start eighth grade.

But soon after the school year began, her parents disenrolled her from the district after she told them she felt unsafe being in the same building as Riep.

H.J. pinpoints the GSA meetings as the beginning of her emotional decline. Before going to the GSA meetings, H.J. never questioned her gender identity or contemplated suicide. No one from the district told her parents that she was attending GSA meetings or that Riep was asking her to attend meetings.

### C.    The Policies

#### 1.    The District's Written Policies

The parents spotlight several written policies of the district, grouping them together as a single core district "Policy." They attached just one policy (the Guidelines) to their proposed amended complaint, so we must rely on the parents' allegations about what the other policies say. The parents refer to the policies by nicknames, which sometimes makes it difficult to tell which policy they are referencing. We've included the names that the parents have assigned each policy, but we mostly refer to the policies by their titles.

***IHAM Policy ("Illusory Notice Policy").*** Under this policy, the district required notice to the parents before their child would be instructed on health education. This enabled parents to excuse their child from attending that curriculum. Though the parents allege that the district intended the GSA meetings with C.L. and H.J. to "advance[] the health education curriculum," App. vol. II, at 298 ¶ 198, the parents do not challenge the school's curriculum

8

or argue that the GSA meetings were subject to this policy, Op. Br. at 32; Reply Br. at 20–21. Instead, the parents allege that this policy "deliberately mollifies parental anxiety and caution regarding the teaching of highly sexualized themes." App. vol. II, at 290 ¶ 151.

***KD Public Information and Communications Policy ("Deceptive Reassurance Policy").*** Under this policy, the district required its staff to "[k]eep the public informed about the policies, administrative operations, objectives, and educational programs of the schools." *Id.* at 291 ¶ 159 (emphasis omitted). The policy placed "great importance on the role of the teacher as communicator and interpreter of the school program to parents[.]" *Id.* at 291–92 ¶ 160 (emphasis omitted).

***Guidelines for Supporting Transgender and Non-Binary Students ("Guidelines").*** Under the Guidelines, the district directed its staff in their interactions about students' gender identity.[3] The parents focus on these provisions:

- "School personnel should not disclose information that may reveal a student's transgender or non-binary status to others, including students, parents, or community members, unless legally required to

---

[3] The proposed amended complaint relies on a revised version of the Guidelines that went into effect two years after the parents' children attended the GSA meetings. We surmise that an earlier version was in effect when C.L. and H.J. attended GSA meetings. App. vol. II, at 275 ¶ 49; *id.* at 284 ¶ 108, 309. The district notes this but provides no additional information. We will consider the version of the Guidelines attached to the proposed amended complaint, because they are central to the parents' claim and no one disputes their authenticity. *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1286 n.3 (10th Cir. 2023).

9

do so or unless the student has authorized such disclosure." *Id.* at 311; *see id.* at 292 ¶ 163.

- "The school counselor will work with the student in coming out to their family and others, as appropriate, *and collaborate with families to promote consistent gender support.*"[4] *Id.* at 311 (emphasis added); *see id.* at 293 ¶ 166.

- "When contacting or communicating with a parent/guardian of a transgender or non-binary student, school staff should use the name and pronouns that the student's parent/guardian use, unless the student requests otherwise." *Id.* at 311; *id.* at 293 ¶ 167.

- "If a parent/guardian asks a staff member about whether their student uses another name/pronoun at school or has other gender-related questions, the staff member should refer them to the school counselor, who can address questions and concerns that the parent/guardian may have. If a school counselor receives questions from a parent/guardian, they should use their professional judgment to determine how best to follow up with the student and then the parent/guardian." *Id.* at 311; *id.* at 293 ¶¶ 167, 169–70.

***Gender Support FAQ ("FAQ").*** The district provided official responses to frequently asked questions about its handling of gender-identity issues. In one response, the district advised that it would not inform a parent of any private discussions between staff and students about sex, sexual orientation, or gender identity. In another, the district said that to "the extent possible, a school counselor will not out the student to their parent(s)/guardian(s) before the student is ready to come out themselves." *Id.* at 294 ¶ 175 (alteration accepted). And in another, the district expressed that school counselors needed

---

[4] The proposed amended complaint omits the italicized language. *Compare* App. vol. II, at 293 ¶ 166, *with id.* at 311. The Guidelines' full language controls. *See Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017).

10

to "balance the inherent right of parents and guardians to their student's information and the potential impact this sharing [of a child's transgender or non-binary status at school] could have on the student and the student's trust in sharing future concerns with the school counselor." *Id.* at 294–95 ¶ 176 (emphasis omitted).

*A Toolkit for Supporting Transgender and Gender Expansive Nonconforming Students ("Toolkit").* The Toolkit stated that "'[p]rior to notification of any parent/guardian . . . regarding the transition process, school staff should work closely with the student to assess the degree, if any, the parent/guardian will be involved in the process' of the child's gender transition." *Id.* at 296 ¶ 181 (emphasis omitted). It also stated that "[w]hen a student elects to transition during the school year, the school should schedule a meeting with the student and parents/guardians (provided they are involved in the process)[.]" *Id.* ¶ 182 (emphasis omitted).

*Individual Gender Support Form ("District Gender Support Plans").* As part of its operations, the district provided "[a]n Individual Gender Support Form [as] an official document included in a child's education records, which directs school engagement with the child. The Individual Gender Support Form dictates how [] school employees are expected to address a particular child." *Id.* ¶ 185. A student could complete the forms without parental consent and school staff could choose not to notify the parents about their child's completing the form until the parent asked. *Id.* at 296–97 ¶¶ 186–88.

11

## 2. The district's de facto policies.

The parents alleged that the district also had several de facto policies, including these:

***GSA Meetings.*** The district had a "*de facto* policy of refusing to notify parents of the child's participation" and of telling the students that the meeting was confidential. *Id.* at 298 ¶¶ 198–99.

***Personnel Training.*** The district encouraged staff to attend training sessions on LGBTQ issues at which staff were trained not to reveal a student's non-conforming gender-identity to the student's parents.

***Circumventing Parental Notice.*** The district stored on its record-keeping software students' personal-identifying information, and any changes needed to be made by a parent or by means that would notify a parent. Even so, district staff sometimes circulated lists of students' preferred names and pronouns without updating the record-keeping software so parents would be unaware of the district's use of a preferred name or pronoun. And the district's medical staff sought guidance from the district on maintaining and using medical records with a student's preferred name without those records becoming legally accessible to parents under federal-disclosure law.

***Misleading Responses to Parental Inquiries.*** After Riep repeatedly met privately with C.L. to discuss gender-identity issues, and after C.L. attended the GSA meeting, the Lees met with Principal Benedict in 2022 and asked whether Riep had an "appropriate relationship" with C.L. Benedict said yes.

12

After the Juriches learned that H.J. had attended two GSA meetings, they met with Benedict and asked if the district had taught any lessons on sexuality at GSA meetings during that academic year. Benedict said it had not.

Both parents allege that Benedict's answers were false and show a de facto policy of misrepresenting information about children's gender-identity to their parents.

## II.    Procedural Background

The Lees and Juriches sued the Poudre School District and the district's Board of Education, on behalf of themselves and their children. They alleged the district had violated their Fourteenth Amendment substantive-due-process rights by interfering with their parental decision-making, for which they sought injunctive relief and monetary damages to reimburse the cost of private education, medical expenses, counseling fees, compensation for damages to the parents' reputation, transportation expenses, and compensation for emotional anguish. The district moved to dismiss the complaint, and the district court granted its motion.[5] *Lee v. Poudre Sch. Dist. R-1*, No. 1:23-CV-01117-NYW-STV, 2023 WL 8780860, at *1 (D. Colo. Dec. 19, 2023).

---

[5] The district court dismissed the complaint on some grounds not relevant to this appeal. For example, the district court concluded the parents lacked standing to seek prospective injunctive relief because none of their children were still enrolled in the district and that the children lacked standing to assert a parental-rights claim. *See Lee v. Poudre Sch. Dist. R-1*, No. 1:23-CV-01117-NYW-STV, 2023 WL 8780860, at *5, *7, *19 (D. Colo. Dec. 19, 2023).

After that, the parents moved to amend their complaint, attaching a proposed amended complaint that substantially narrowed their suit. The proposed amended complaint dropped the minor children as plaintiffs, removed the Board of Education as a defendant, and no longer sought injunctive relief. The proposed amended complaint contained one count against one defendant— the district—and sought money damages for a violation of their Fourteenth Amendment rights.

The district opposed the motion to amend the complaint, contending that the proposed amendment would be futile. The court agreed with the school district after concluding that the plaintiffs had failed to plausibly allege municipal liability against the district. *Lee v. Poudre Sch. Dist. R-1*, No. 1:23-CV-01117-NYW-STV, 2024 WL 2212261, at *11 & n.10 (D. Colo. May 16, 2024). The parents timely appealed the judgment.

## STANDARD OF REVIEW

"We review the district court's denial of leave to amend for an abuse of discretion." *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1033 (10th Cir. 2020). Though courts should freely grant leave to amend a complaint, they may deny leave to amend if doing so would be futile. *Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1217–18 (10th Cir. 2022); *see* Fed. R. Civ. P. 15(a)(2). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Chilcoat*, 41 F.4th at 1218 (internal quotation marks omitted). Here, the district court deemed the proposed amended

complaint futile after concluding that it failed to state a plausible municipal-liability claim. *Lee*, 2024 WL 2212261, at *11 & n.10; *see* Fed. R. Civ. P. 12(b)(6). "When a district court denies amendment based on futility, our review for abuse of discretion includes de novo review of the legal basis for the finding of futility." *Chilcoat*, 41 F.4th at 1218 (internal quotation marks omitted). So we review de novo whether the proposed amended complaint states a plausible municipal-liability claim. *See id.*

## DISCUSSION

### I.    The Parents' Substantive-Due-Process Claim

The parents bring a Fourteenth Amendment substantive-due-process claim against the district, arguing that by "discourag[ing] disclosure" of a child's transgender status, the district's policies violated their parental rights as guaranteed by the Fourteenth Amendment's Due Process Clause.[6] Op. Br. at 4. Substantive-due-process claims are rooted in the Fourteenth Amendment Due Process Clause's "substantive component that provides heightened protection

---

[6] By "discouraged disclosure" as alleged in this case, the parents refer to (1) Riep's and Chambers's discouraging the GSA attendees from telling their parents what was discussed at those meetings, and (2) Riep's private conversations with C.L. during which Riep told C.L. she could reject feminine pronouns. Not implicated in this appeal are other categories of what might fall into a category of "discouraged disclosure," including the district's use of a student's affirming name and pronouns at school but use of the student's legal name with parents, along with all other efforts to conceal that from the parents. *See* App. vol. I, at 48. Because the parents allege that the only discouraged disclosure in this case occurred at the GSA meetings and in Riep's private conversations with C.L., we have no need to decide whether other instances of discouraged disclosure would violate a fundamental right.

15

against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (internal quotation marks omitted). The asserted fundamental liberty interest must be precise and only cautiously expanded to prevent courts from transforming "the liberty protected by the Due Process Clause" into their policy preferences. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *accord Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 239–40 (2022).

The Supreme Court has recognized that parents have a fundamental right to determine "the care, custody, and control of their children." *Troxel*, 530 U.S. at 66. That right includes the ability "to direct the upbringing and education of children under [the parents'] control." *Id.* at 65 (quoting *Pierce v. Soc'y of the Sisters of the Holy Name of Jesus & Mary*, 268 U.S. 510, 530, 534–35 (1925)). Embedded in a parent's fundamental right is a "traditional presumption that a fit parent will act in the best interest of his or her child." *Id.* at 69. That parental right includes the right to "control the education" of their child, *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923), which encompasses the right to remove their child from public school, *Pierce*, 268 U.S. at 530, 534–35.

But the scope of that right has limits. For example, parents have no right to "replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society[.]" *Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 239 (1972) (White, J., concurring)). And our court has

16

ruled that a parent doesn't have "a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998).

After briefing and oral argument, we remain uncertain about what the parents assert qualifies to meet their asserted fundamental right. They simply restate the broad descriptions of parental rights described above. At oral argument, counsel simply pointed us to *Troxel v. Granville*, 530 U.S. 57 (2000), for the principle that parents are presumed to act in the best interest of their child, with "full deference [being] due to the parents." Oral Argument at 10:22–10:34. From that they argue that the district violated that fundamental right because its policies ignored the presumption in favor of the parents and instead "gave the deference to school administrators."[7] *Id.* So as we understand it, the parents assert a general substantive-due-process right barring school districts from discouraging disclosure of information to parents.[8] *Id.* at 09:40–

_____

[7] In *Troxel*, the Supreme Court held unconstitutional a state statute that permitted visitation rights with a child if the visitation served the best interest of the child. 530 U.S. at 60, 63. The Court struck down the statute, because the statute allowed judges to decide what was in the best interest of a child without any deference to the objection of a fit custodial parent. *Id.* at 67, 72. The Court noted that the parental right contains a "traditional presumption that a fit parent will act in the best interest of his or her child." *Id.* at 69.

[8] At oral argument, the parents conceded that their parental rights do not *require* the school to disclose information. Oral Argument at 09:40–09:54. In other words, the parents do not allege they had a right to be told their child was being asked to attend, or was attending, GSA meetings.

09:47. At oral argument, the parents argued that the asserted right against "discouraged disclosure" (that is, the teachers' cautioning the GSA attendees against telling their parents about the meetings) applies only "on the transgender issue." *Id.* at 13:00–13:15. But the parents cite no authority for what "the transgender issue" includes, and fail to argue why the right would apply only to that information.

Ultimately, we need not decide whether the parents have sufficiently identified a fundamental right that would afford them relief, *see Glucksberg*, 521 U.S. at 720–21, because we conclude that they've failed to plausibly allege municipal liability.

## II.   The parents fail to plausibly allege municipal liability against the district.

### A.   Legal Framework

To state a plausible municipal-liability claim, a plaintiff must allege (1) that the municipality had a policy or custom, which can take multiple forms, including a formal regulation or policy statement, or a widespread practice that was "so entrenched . . . as to constitute an official policy";[9] (2) that the

---

[9] We recognize three other forms of municipal policy or custom: "[1] the decisions of employees with final policymaking authority; [2] the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or [3] the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (internal quotation marks omitted). The parents have not

(*footnote continued*)

municipality was deliberately indifferent to the obvious consequences of the policy; and (3) that the policy caused the plaintiff's constitutional injury. *See Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022); *see also Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019); *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91 (1978).

To demonstrate deliberate indifference, the parents "may show that the municipality had actual or constructive notice that its action or failure to act was substantially certain to result in a constitutional violation and consciously or deliberately chose to disregard the risk of harm." *Finch*, 38 F.4th at 1244 (cleaned up). "Notice can be established through a pattern of tortious conduct or if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Id.* (internal quotation marks omitted).

To establish causation, the parents must allege more than that an employee violated their constitutional rights. *Monell*, 436 U.S. at 691. In addition, they must plausibly allege that the district "through its *deliberate* conduct . . . was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). In other words, the parents must show "a direct causal link between the municipal action and the deprivation of federal rights." *Id.* We apply such "rigorous standards of culpability and

---

raised these other forms of municipal policy or custom as being at issue in this case. *See* Reply Br. at 10.

causation . . . to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405.

### B.     Analysis

The parents assert that the district violated their parental rights through a formal regulation and through an associated informal custom. But the parents don't identify a formal regulation of the district requiring the GSA meetings or Riep's and Chambers's statements at them. Instead, in a single sentence in their briefing, they argue that the policies "promote[d]" the idea that the district knew better than the parents and that approval of this idea authorized the GSA meetings and the teachers' statements and activities at the meetings. Reply Br. at 10–11; *see id.* (arguing that the district's policies are formal regulations because they "individually and collectively promote the idea that parents are not trustworthy, that disclosure is to be discouraged, and that the school employee's judgment is superior to the parents' when it comes to issues of gender identity and expression"); App. vol. II, at 303 ¶ 223 ("Taken together, [the district's] official and *de facto* policies evidence a custom and unwritten policy of secrecy towards parents on matters regarding transgenderism, sexual orientation, and gender identity."); App. vol. II, at 305 ¶ 233 ("This avoidance of parental disclosure and encouraged student secrecy was undertaken as part of the custom and standard operating procedures of [the district].").

But the parents have not plausibly alleged that policy was the moving force behind their alleged constitutional injury.[10] The parents don't explain how policies that presume the district knows better than parents, or that discourage disclosure, directly caused district staff to do any of the following:

- recruit students to attend GSA meetings (including by misleading one student to coax her attendance),

- present dubious information to students about being transgender and about suicide,

- award prizes to students if they identify as transgender at the meeting,

- offer the staffs' personal contact information to students so they could talk any time, and

- tell students that they didn't have to tell their parents about what happened at the meeting, and that it might be unsafe to talk with their parents about gender-identity issues.

Though a formal regulation or widespread practice that discourages disclosure may be "in harmony" with what happened here, under our rigorous causation standard, the parents haven't plausibly alleged it was the moving force of their alleged injury. Op. Br. at 1.[11]

---

[10] We will assume without deciding that the district's policies meet our definition of a formal regulation or policy statement. We will also assume that the policies promote the ideas the parents allege.

[11] We also note that the parents have not plausibly alleged deliberate indifference—that is, the parents have not alleged that the district was on "actual or constructive notice" that its policies or customs were substantially certain to cause constitutional violations but still deliberately chose to disregard that risk. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 771 (10th Cir. 2013) (internal quotation marks omitted).

## CONCLUSION

We affirm.

No. 24-1254, *Lee v. Poudre School District R-1*

**McHUGH,** Circuit Judge, concurring:

I concur in the result, but I write separately because in my view, the parents have alleged that the district's policies implicate a cognizable substantive due process right. As alleged, the district's employees, by policy, are required to help students conceal their gender identities from their parents. If such a policy exists, it runs counter to the constitutional "presumption that fit parents act in the best interests of their children." *Troxel v. Granville*, 530 U.S. 57, 68 (2000). But the present parents have not alleged that this policy injured them; the only injury they point to is an impaired parent–child relationship after several district employees encouraged C.L. and H.J. not to discuss their gender identities with their parents. Yet the *district's policies* do not instruct employees to discourage students from discussing their gender identities with their parents, and thus did not cause these injuries. Accordingly, I concur in the judgment.

The parties focus their arguments on the written Guidelines, which holistically set forth the district's policies for supporting transgender students. At multiple points, the Guidelines instruct employees to help students conceal their gender identities from their parents, if the student so chooses. Most pointedly, the Guidelines state: "When contacting or communicating with a parent/guardian of a transgender or non-binary student, school staff should use the name and pronouns that the student's parent/guardian use, unless the student requests otherwise." App. Vol. II at 311. The Guidelines also instruct district employees not to disclose information about a student's gender identity to the student's parents "unless legally required to do so or unless the student has authorized such

disclosure." *Id.* And if a parent asks "whether their student uses another name/pronoun at school or has other gender-related questions, the staff member should refer them to the school counselor, who can address questions and concerns that the parent[] may have," using the counselor's "professional judgment." *Id.* at 311. School counselors, for their part, are instructed to "work with [a transgender] student in coming out to their family and others, *as appropriate*." *Id.* (emphasis added).

Additionally, if a student does not want her parents to be involved in preparing a District Gender Support Plan, the Guidelines instruct district employees to "work with the student to support them in their coming out process," noting some students may not want to notify their parents for "personal reason[s]." *Id.* at 319. At the same time, the Guidelines recognize that Support Plans are educational records parents can access under the Family Educational Rights and Privacy Act ("FERPA"). *Id.* But the parents allege the district's employees have created internal lists of students' preferred names and pronouns, thus eliminating any need for students to submit Support Plans or otherwise update the district's online system with their preferred names and pronouns—all to ensure that parents are not told about their children's gender identities. *Id.* at 300–01.

The parents also point to several expressions of the district's policy outside the Guidelines. They allege that in an answer to frequently asked questions, the district stated its employees will "not out [a transgender] student to their parent(s)[] before the student is ready to come out themselves." *Id.* at 294. They claim the district has a "Toolkit" resource instructing its employees that before alerting parents about a child's "transition process, school staff should work closely with the student to assess the degree, *if any*, the

2

parent/guardian will be involved in the process." *Id.* at 295–96. The parents also assert that the district's employees attended trainings at which they were directed not to "reveal a student's in-school transgender or gender non-conforming identity to that student's parents." *Id.* at 299–300.

In sum, the parents have plausibly alleged that the district, by policy, requires its employees to help students conceal their gender identities from their parents. This policy implicates a substantive due process right the Supreme Court has frequently enforced: "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66. This right "is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Id.* at 65. And integral to this right is the "presumption that fit parents act in the best interests of their children." *Id.* at 68. By so presuming, we recognize that "[t]he child is not the mere creature of the state," *Pierce v. Soc'y of the Sisters*, 268 U.S. 510, 535 (1925), and "the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder," *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). This presumption applies unless there is a showing of parental unfitness, such as "inciden[ts] of child neglect and abuse." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). Indeed, "[t]he statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Id.* at 603.

The district's policy of helping students keep their parents in the dark about their gender identities turns this presumption on its head. The policy assumes that children of

3

all ages possess sufficient wisdom and maturity to decide their gender identity—and even to transition genders—without parental involvement. But under the Supreme Court's jurisprudence, parents, not children, are presumed to possess the "maturity, experience, and capacity for judgment required for making life's difficult decision." *Parham*, 442 U.S. at 602. While the district may disagree with how some parents may react when they learn about their children's gender identities, the district may not seize control of a child's upbringing based on a "simple disagreement" about what is in the child's best interests. *Troxel*, 530 U.S. at 72. To the contrary, "so long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68–69.

Quite simply, although the Constitution presumes that parents will act in their children's best interests, the district's alleged policy presumes otherwise by helping students hide important information from their parents. This policy impedes parents' longstanding, fundamental right "to speak and act on their [children's] behalf."[1] *See*

---

[1] Of course, courts must tread carefully when entering "the 'treacherous field' of substantive due process," *Troxel v. Granville*, 530 U.S. 57, 76 (2000) (Stevens, J., concurring), and we must attempt "to rein in the subjective elements that are necessarily present in due-process judicial review," *Washington v. Glucksberg*, 521 U.S. 702, 722 (1997). Thus, if the parents had alleged that the district's policy did, in fact, cause a cognizable injury, we would need to closely compare their alleged liberty interest with interests recognized by existing precedent. In my view, the district's alleged policy of helping students hide sensitive information from their parents implicates the Supreme Court's prior descriptions of parents' fundamental right to control their children's upbringing. But I do not address whether the district's policy, as applied to different parents in a different case, would violate substantive due process.

4

*Hodgson v. Minnesota*, 497 U.S. 417, 483 (1990) (Kennedy, J., concurring in part and dissenting in part).

But as the majority aptly explains, the parents have not alleged that the district infringed this or any other fundamental right. Nothing in the first amended complaint indicates that the district refused to give the parents information about C.L. and H.J.'s gender identities. After she attended her first GSA meeting, C.L. returned home and immediately told her parents that she was transgender. The Lees, therefore, knew from the beginning about C.L.'s newly assumed gender identity. For her part, H.J. never told any district employees that she was transgender, and the Juriches do not allege they were ever denied information about H.J.'s gender identity.

The parents instead allege they were injured because their relationships with their daughters were "very strained" after Ms. Riep and Ms. Chambers encouraged the daughters not to discuss their gender with their parents. Oral Argument at 23:20. But nothing in the Guidelines or the other alleged policies instructs district employees to *discourage* students from discussing issues of gender with their parents. Instead, the policies simply require employees to assist students in withholding that information—if the student makes the decision not to tell. The policies instruct that if the student chooses not to tell her parents, the district employees are to assist with the student's "coming out."

Further, if the district's policy of helping students who choose not to tell their parents about their in-school gender identities infringes a fundamental right, the parents here have not explained how that policy injured them. Recall that despite Ms. Riep's encouragement not to reveal her transgender status, C.L. immediately told her parents she

5

was transgender. And because H.J. never told anyone at the district that she was transgender, there was no information to withhold. Therefore, the parents have not pleaded a core element of municipal liability—that the district's allegedly unconstitutional policy was a moving force that "directly caused" their injuries. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 415 (1997).

Accordingly, I concur that the district court correctly dismissed the case for failure to state a municipal-liability claim.